## BONWIT TELLER, Inc. v. NATIONAL LABOR RELATIONS BOARD.

### No. 250, Docket 22208.

United States Court of Appeals, Second Circuit.

Argued April 14, 1952.

Decided June 17, 1952.

Swan, Chief Judge, dissented in part.

Drechsler & Leff, New York City, (David Drechsler and Mortimer Horowitz, New York City, of counsel), for Bonwit Teller, Inc., petitioner-appellant.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Mozart G. Ratner, Assistant General Counsel, and Duane Beeson, Washington, D. C., for National Labor Relations Board, respondent.

Sheppard, Mullin, Richter & Balthis and George R. Richter, Jr., Los Angeles, Cal., for National Retail Dry Goods Ass'n, amicus curiae.

Schlesinger & Bloom, New York City, for Intervenors, Retail Clerks International, A. F. L.

Before SWAN, Chief Judge, and AUGUSTUS N. HAND and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Bonwit Teller, Inc., has petitioned to review and set aside an order of the National Labor Relations Board, and the Board has cross-petitioned for enforcement of its order. The proceedings before the Board were initiated by the Retail Clerks International Association, AFL (hereinafter called the "Union"), which filed objections with the Board to the effect that Bonwit Teller had interfered in an election held by the Board to determine the bargaining representative of Bonwit's employees. The Union subsequently filed a charge of violation of Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1), by Bonwit Teller, based substantially on the conduct previously asserted as constituting interference with the election. This charge was consolidated with the representation proceeding.[1]

The present controversy is for the most part concerned with inferences to be drawn from and the application of the Act to facts which are substantially undisputed. Bonwit Teller, Inc., owns and operates several retail stores in various cities throughout the eastern United States, its principal store being located at 721 Fifth Avenue in New York City where it employs about 900 people. During the early part of 1949 campaigns were conducted by rival unions to organize Bonwit's employees at its New York City store and at its branch store in White Plains, New York, the latter having approximately 90 employees. On June 30, 1949, the Board held an election at both stores at which the employees were given a choice of voting for no union, or the R. C. I. A., or the Amalgamated Clothing Workers of America, C. I. O. However, the election proved inconclusive, with neither the R. C. I. A. which polled 446 votes, the Amalgamated Clothing Workers which received 146 votes, nor the 305 employees who voted for no union, obtaining a majority of the votes. The Board, therefore, directed that a run-off election be held and eliminated the Amalgamated Clothing Workers from the ballot. The second election—from which stem the charges of unfair labor practices—was held on September 15, 1949 and resulted in a vote for no union by a majority of 668 to 225.

Throughout the period leading up to the election of September 15, 1949, Bonwit Teller maintained a policy of forbidding all solicitation by union organizers in its stores either during the employees' working time or when they were off duty.[2] Organizers who entered the stores were asked to leave as soon as they were detected. The organizational drive by the Union was conducted by distribution of leaflets to employees as they entered or left the stores and at meetings which were held at Union headquarters or in halls rented by the Union for that purpose. While there is some dispute as to how successfully the no solicitation rule was enforced by Bonwit we do not consider that fact of importance since it is undisputed that Bonwit had a no solicitation rule in effect and attempted to enforce it whenever violations came to the attention of supervisory personnel.

On Friday, September 9, six days before the run-off election was to be held, the employees at the New York City store were

---

1. In addition to its order requiring Bonwit Teller to cease and desist from certain specified unfair labor practices, the Board set aside the results of the election and directed that a new election be held at some time in the future. In its brief, Bonwit Teller requests that we also review this action of the Board. But it is clear that we have no power to do so, A. F. L. v. N. L. R. B., 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; N. L. R. B. v. LaSalle Steel Co., 7 Cir., 178 F.2d 829, 832 n. 1, because the order was not a final order reviewable under Section 10(f) of the Act, 29 U.S.C.A. § 160(f).

2. Ordinarily, such a rule would constitute a violation of § 8(a) (1). See Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372. However, the Board has recognized an exception in the case of retail department stores which allows the employer to forbid any solicitation on the selling floors of the store. See e. g., May Department Stores, 59 N. L. R. B. 976. For reasons hereinafter stated, this exception is not applicable in the case at bar.

informed that an employees' meeting was to be held on the main selling floor at 5 P. M., one-half hour before the store's normal closing time.[3] The Board made no finding that the employees were compelled to attend this meeting and we may assume that employees were urged to go to the meeting, although they were free to leave the store if they wished to do so.

After the employees were assembled, Roy Rudolph, the president of Bonwit's, delivered a speech in which he strongly urged the employees to vote against the Union at the coming election. The Board found nothing wrong with this speech, except for the last paragraph, in which Rudolph answered a Union assertion that Bonwit's employees were entitled to a pay increase as follows:

"As you know, twice a year your salary is reviewed and raises are recommended. Raises have been waiting for you since last February. Now, with our Fall review in process, additional raises are being recommended. These raises could not be put through then and cannot be put through now before the election, lest we be accused of an unfair labor practice by R.C.I. A. You don't have to pay dues to a union to get a raise at Bonwits."

The speech was repeated the following morning to the employees of the White Plains store and copies of the speech were mailed to employees of both stores. Thereafter, and until September 15—the day of the election—Rudolph met informally with groups of employees in departmental meetings and discussed with them working conditions then prevailing in the stores and continued to urge them to vote against the Union. According to the witness Barnes, Rudolph told employees at one of the meetings that "the increase [in wages] would come after the union, after the affair with the union was over with."

The Board found that "* * * the announcement of the pendency of wage increases in President Rudolph's speeches of September 9 and 10, and in the depart-

mental meetings, constituted a promise of benefit to employees, which was reasonably calculated to deter them from voting for the RCIA in the run-off election of September 15, 1949, thereby violating Section 8(a) (1) of the Act, and interfering with their freedom of choice in the election. It is immaterial that the Respondent did not expressly condition the granting of wage increases on RCIA's losing the election. It is sufficient that the purpose, and natural effect, of the announcement was to convince the employees that they did not need a union in order to obtain wage increases or other improvements in their conditions of employment."

On September 12, which was the Monday following Rudolph's store-wide speeches, the Union's vice-president, Samuel Meyers, notified Bonwit Teller by registered mail that he desired an opportunity to address all of Bonwit's employees at the New York store "on Wednesday, September 14, 1949, at 5:00 p. m., or at some time before the date of the run-off election on September 15, 1949, which will be mutually convenient to both of us. I further request that you accord me the same privilege of speaking to them during the working hours so that I will be assured of the same complete audience of which you availed yourself." No answer to the request was ever received by the Union, and the Board held that Bonwit's refusal to honor this request was a violation of Section 8(a) (1).

The other unfair labor practices found by the Board consisted of statements made to employees by two supervisory employees, Neimark and Burchett. On one occasion following a departmental speech by Rudolph, a group of employees were having a discussion and, according to the testimony of Dorothy Dercole, "Mr. Neimark came over and asked us if we had any questions * * * And he said if the union was voted out we would get the increase immediately and if it was voted in we would not get it for nine months or even a year, because it would take that long to negotiate a contract with them." Burchett, who was head of

---

3. The customers' entrances to the store were closed at 5 P. M., but customers already in the store were allowed to complete their shopping.

the alteration department, told several employees in his department that if the Union was voted in, Bonwit would have to change its system of layoffs (which in the past had been based on family conditions and need rather than on seniority) and that its existing wage and promotion policies based on merit "would go out the window." These statements the Board found to contain threats of reprisal.

■ Bonwit Teller contends that the whole proceeding should be set aside because the Board lacked a General Counsel during part of the hearing before the Trial Examiner. The Board overruled this contention, based on a literal reading of Section 3(d) of the Act, 29 U.S.C.A. § 153(d), which vests in the General Counsel exclusive authority to prosecute complaints. Before his resignation the General Counsel had delegated to his representative at the hearing authority to prosecute the complaint. We find no impropriety in such a procedure and hold that the objection to it was properly overruled.

■ The conclusion of the Board that the speeches of Rudolph and the statements of supervisors Niemark and Burchett involved promises of benefit or threats of reprisal seems to us to have been erroneous. As to Rudolph, his remarks to the effect that wage increases were waiting for the employees were nothing more than an explanation of why Bonwit's policy of semi-annual wage reviews and recommendations had stopped. The Trial Examiner in his intermediate report described that policy and the events leading up to the speeches of Rudolph, Niemark and Burchett as follows:

"The evidence establishes that in 1947 the Respondent instituted a policy of having supervisors rate employees twice yearly, in February-March and August-September, on the character of their performance, and making recommendations as to individual or merit wage increases. Generally some increases are granted, though not necessarily to everyone, as a result of these reviews and recommendations. Burchett, head of the Respondent's alteration department, testified, for example,

that all the employees in his department could expect at least one wage increase each year, and that his recommendations were usually followed. This procedure, except in some instances where a department head, in violation of instructions, failed to acquaint employees with it, was generally known to the employees.

"In Febrauary 1949, while the representation proceeding was pending, the supervisors began to process the merit ratings and wage recommendations. According to Treasurer Leonard a large number had been completed or partially completed when management issued instructions to supervisors to discontinue processing them. The reason for this action, Leonard testified, was that 'we decided that we did not want to grant any increases at that particular time because of the pending labor situation.' Of the ratings and reviews processed up to that time, 250 to 300 contained recommendations for wages increases. Some, though not all, of the employees were aware of the stop order. Thus in March or April 1949, a group of tailors asked Department Head Burchett what had happened to the spring wage reviews. Burchett responded: 'I told them that I could not pass any increases. That was an order from the personnel department. Because of the labor situation at that time and union activities, and so on, we could not pass increases at that time.' It was to this situation that Rudolph referred in his September 9 and 10 speeches, and in the departmental meetings."

Under the circumstances we think that the communications of Rudolph to his employees went no further than to indicate that increases in pay would follow the ordinary practice of the employer and fell short of promising benefits to the employees if they should vote against the Union. Indeed, to forbid such communications would seem to prohibit all discussions between employer and employee of issues germane to the subject of unionization. 29 U.S.C.A. § 158(c); N. L. R. B. v. American Tube

Bending Co., 2 Cir., 134 F.2d 993, 146 A.L. R. 1017; N. L. R. B. v. Virginia Electric & Power 'Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348.

Likewise, we think the remarks of Niemark and Burchett to the employees ought not in reason to be interpreted as threats of reprisal if the employees voted in favor of the Union. Niemark's statement seems to have been no more than a reasonable argument that the bargaining process would inevitably delay any wage increase and did not carry with it the threat that the company would cause such delay. Burchett's utterances we think cannot be given a sinister meaning. We have no reason to suppose that the employees preferred a classification based on merit rather than on seniority, and unless that were true the change mentioned by Burchett could not possibly be regarded as detrimental to them. It seems to us that in any event it was no more than an argument involving no threats of reprisal by the employer.

The last question to be decided is the correctness of the Board's holding that Bonwit Teller violated § 8(a)(1) [4] of the Act by failing to grant the Union's request for an opportunity to reply to Rudolph's speech under similar conditions, namely, at a meeting of the employees to be held on the company's premises. Bonwit Teller contends that the Board's decision is contrary to § 8(c) [5] of the Act because it conditions the employer's exercise of the right to speak to his employees on his extending to the Union the same opportunity—a condition which is not contained in § 8(c). However, neither § 8(c) nor any issue of "employer free speech" is involved in this case.

Normally, an employer cannot forbid union solicitation on company property during non-working time even where there is no showing that solicitation away from the plant would be ineffective. Republic Aviation Corp. v. N.L.R.B., 324 U. S. 793, 65 S.Ct. 982, 89 L.Ed. 1372. This is so because the place of work has been recognized to be the most effective place for the communication of information and opinion concerning unionization. The Board, however, has allowed retail department stores the privilege of prohibiting all solicitation within the selling areas of the store during both working and nonworking hours,[6] e: g., In the Matter of May Department Stores Co., 59 N.L.R.B. 976, 981. Bonwit Teller chose to avail itself of that privilege and, having done so, was in our opinion required to abstain from campaigning against the Union on the same premises to which the Union was denied access; if it should be otherwise, the practical advantage to the employer who was opposed to unionization would constitute a serious interference with the right of his employees to organize. This principle was recognized by the Court of Appeals for the Seventh Circuit—in a court consisting of Judges Kerner, Minton and Lindley, where Judge Minton wrote the opinion—which held that this form of discrimination by the employer was evidence of interference with the right of its employees to self-organization. N.L.R.B. v. American Furnace Co., 158 F.2d 376. Similarly, in N.L.R.B. v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704, the Supreme Court held that the issuance of ships' passes to representatives of one union and the refusal to issue such passes to a rival union was an unfair labor practice under § 8(1) of the former Act. See also In the Matter of May Department Stores Co., supra, 59 N.L.R.B. at page 979.

4. "It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7."

5. "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

6. Apparently Bonwit's no-solicitation rule was not restricted to the selling areas alone, for there was testimony that union organizers were driven out of other portions of the premises when they were attempting to solicit employees.

However, the Board's order in its present form has been too broadly drawn. It requires Bonwit Teller to cease and desist from: "* * * making antiunion speeches to the Respondent's employees during working hours and on the Respondent's premises, without according, upon reasonable request, a similar opportunity to address the employees to the labor organization against which such speeches are directed." As we have indicated above, the violation here was the discriminatory application of the no-solicitation rule. If Bonwit Teller were to abandon that rule, we do not think it would then be required to accord the Union a similar opportunity to address the employees each time Rudolph made an anti-union speech. Nothing in the Act nor in reason compels such "an eye for an eye, a tooth for a tooth" result so long as the avenues of communication are kept open to both sides.

Enforcement of the order is denied and the proceedings are remanded to the Board with directions to proceed in accordance with this opinion.

SWAN, Chief Judge (dissenting in part).

I dissent from so much of the opinion as holds that because of the employer's no-solicitation rule it was an unfair labor practice not to grant the union's request for an opportunity to reply to Rudolph's speech under similar conditions. Section 8(c) of the Act as amended, 29 U.S.C.A. § 158(c), grants the employer the privilege of arguing against unionization without any limitation except that the expression of his views must contain "no threat of reprisal or force or promise of benefit." It is clear from the legislative history, which criticized as too restrictive the decision in Clark Brothers, 70 N.L.R.B. 802, that Congress intended the employer to have the right to address his employees on company time and property.[1] There is no suggestion that if he exercised the right he must accord to union representatives a similar opportunity. My brothers apparently agree that he need not, unless he has in effect a no-solicitation rule. I am unable to see the relevancy of such rule in the interpretation to be given to section 8(c). As Board member Reynolds well says in his dissenting opinion:

"The legislative history attendant the enactment of Section 8(c) is replete with assurances that its passage would guarantee free speech to employers in labor disputes. That this freedom of speech encompassed the right to address employees in the plant, as did Respondent's President, is beyond question. Nowhere in the Act or in its legislative history, however, does it appear that a concomitant of this right is the obligation to provide a forum of debate for unions. Indeed, hinging an employer's right to speak upon his readiness to make available the means by which his arguments, views, and opinions can be nullified, effectively emasculates Section 8(c) as it applies to the right of an employer to address his employees."

Nor do I find persuasive the authorities cited in my brothers' opinion in support of this part of their decision.[2] They were decided prior to enactment of section 8(c). I think enforcement of the order should be denied without remand for further proceedings.

1. Senate Report No. 105 on S. 1126, Legislative History of the Labor Management Act, 1947, p. 429.

2. Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; N. L. R. B. v. American Furnace Co., 7 Cir., 158 F.2d 376; N. L. R. B. v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704.