**GENERAL MOTORS ACCEPTANCE CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 72-1128.

United States Court of Appeals, First Circuit.

Heard Feb. 6, 1973.

Decided April 6, 1973.

Edmond J. Dilworth, Jr., Detroit, Mich., with whom Ross L. Malone, Harry S. Benjamin, Jr., Eugene L. Hartwig, J. R. Wheatley, and Robert N. Price, Detroit, Mich., were on brief, for petitioner.

Stanley J. Brown, Atty., Washington, D. C., with whom Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Abigail Cooley Baskir, Atty., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

In this proceeding General Motors Acceptance Corporation (GMAC or the company) seeks review of a Labor Board order [1] holding that it violated § 8(a)(1) and (5) of the National Labor Relations Act. 29 U.S.C. § 158 (1970). Specifically, GMAC challenges Board findings that it coerced its employees in the exercise of their § 7 rights by suspending payment of merit increases and by soliciting signatures on letters repudiating the union;[2] also that it violated § 8(a)(5) by failing to bargain in good faith. The Board cross-petitions for the enforcement of its order. For the reasons set forth below, we grant the petition for enforcement.

1. The Board's decision and order are reported at 196 N.L.R.B. No. 13 (1972).

2. Congreso de Uniones Industriales de Puerto Rico.

The salient background facts are as follows. In early 1968 GMAC, a wholly owned subsidiary of General Motors Corporation which was engaged in the financing of motor vehicles, had in effect a program of semiannual merit reviews covering the performance of its field representatives[3] in its San Juan, Puerto Rico office. The representatives whose work was rated "fair" or higher were usually given salary increases as a result of this review. In September 1968, when the union first made its presence known, the company discontinued this policy and informed the field representatives that no further raises would be given until the status of the union was settled. On November 21, 1968, following a consent election, the union was certified as the bargaining agent for the representatives.

Negotiations between the union and GMAC began on December 12, 1968, and continued at a leisurely pace for the next seventeen months. Although the union was in part responsible for the slow-paced nature of the bargaining, the company's selection of a team of negotiators based on the mainland and able to visit Puerto Rico only for very brief periods each month appears to have been a major source of delay. Also, throughout this period, while the company continued to conduct the semiannual employee evaluations and was forced by competitive conditions to pay higher salaries to newly hired employees, it persisted in withholding all merit increases. The upshot of this policy was that by December 1969 a number of experienced representatives were receiving salaries lower than those being paid to newly hired, inexperienced employees. As an outgrowth of this situation, the company began to receive a number of complaints about its freeze on merit increases. When the company insisted that its hands were tied until negotiations with the union were settled, employee dissatisfaction with the union soon became widespread.[4]

In the meantime, negotiations continued to proceed at a sluggish pace.[5] Following a single half day meeting in December 1969, the parties met for two half days in both March and April. On May 4, 1970, a company official sent a letter to all employees which purported to summarize the status of the negotiations. This letter read in part as follows:

"To summarize, I would say the present status of the negotiation is unclear. It does appear, however, that with the many items still remaining and judging from the pace of past bargaining and the results thereof, an early resolution is highly speculative.

"In conclusion, I would like to make one more point. I have been told that the Field Representatives feel that without the Union to protect them, they would be discharged from their employment. This is completely false. Our objective is to manage fairly and with justice to all employees."

At the May 15 bargaining session the union abandoned all of its proposals and acceded to the company's position on all

---

3. A field representative's primary duties include adjusting past due retail accounts and making wholesale collateral audits within an assigned territory.

4. For example, on February 27, 1970, five representatives met with company officials and, after expressing dissatisfaction with their current salary levels and also with the prolonged nature of the negotiations, asked what steps they might take to rid themselves of the union. Branch manager Marr replied "that they could get out of the union the same way they got in." Similarly, in May 1970 when employee Cintron complained to Assistant Branch Manager Requena about his financial situation and the fact that new employees were earning more than he was, he was told "[t]hat due to the increase in the cost of living these people started with a higher salary but because of the problem between the company and the union . . . [you] did not get a raise."

5. The parties' course of conduct during the negotiations will be considered in detail, *infra*, in conjunction with the § 8(a)(5) charge.

issues except retroactivity. GMAC's bargaining team then announced that they were returning to the mainland to study the union's offer and to await union notification as to whether it found their retroactivity proposal satisfactory. Five days later, in spite of intense pressure from the employees to conclude the negotiations, the union informed the company that it was maintaining its position on this issue. The parties then agreed to meet again in Puerto Rico on June 10.

During the first week of June, at the direction of the GMAC bargaining team, company officials in San Juan solicited and obtained the signatures of six field representatives, all of whom had previously expressed dissatisfaction with the union, on letters prepared by the company which stated that they "voluntarily disavow[ed]" the union as their collective bargaining agent. At the June 10 meeting the company, relying on these letters and the numerous oral expressions of employee discontent it had received, withdrew recognition from the union expressing doubt as to its majority status. Thereupon the union filed the instant unfair labor practice charges. In October 1970, the company granted substantial non-retroactive merit increases to all of the field representatives which it conceded were "catch-up" raises for those which had been withheld for the previous two years.

Based on this background a majority of the Board concluded that by "denying merit increases to its employees after awarding them satisfactory work performance ratings, implying that [they] should abandon the Union to obtain withheld merit increases, assisting its employees in the preparation of necessary papers for disaffiliation from the Union, delaying bargaining, and break-

ing off negotiations," GMAC had, in effect, engaged in a systematic campaign designed to undermine employee support for the union. The company raises objections to each of these unfair labor practice findings.

██ Turning first to the pivotal issue of the suspension of merit increases, the company contends initially that the Board was barred by § 10(b) of the Act, 29 U.S.C. § 160(b) (1970), from finding this conduct unlawful because the original decision to stop paying these raises was made more than six months before the complaint in this action was filed.[6] The Board's rejoinder, which we find persuasive, is that its finding on this charge is based not upon GMAC's initial decision to take this action but rather upon a number of acts committed within the limitations period which, when viewed in the aggregate, indicate that GMAC was attempting to discredit the union by shifting full responsibility to it for the employees' loss of the merit increases. For example, in May 1970 the company conducted a merit evaluation and informed individual employees how their work had been rated. When a number of representatives complained about not receiving increases following this evaluation, the company was quick to point out that no raises could be had until the negotiations were settled. The company's letter of May 4 to all of the employees served only to exacerbate the situation. By characterizing the present status of the negotiations as "unclear" and the chances of an early settlement as "highly speculative," the company further fanned the embers of employee discontent. The solicitation of the letters repudiating the union was the final step in this campaign. Given these events, all of which occurred within the limitations period and which, when con-

---

6. Section 10(b) provides in part: "That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board. . . ." As noted above, the company stopped paying merit increases in September 1968 and the complaint was filed on June 10, 1970. Thus, any conduct which took place before December 10, 1969, falls outside the limitations period.

sidered in concert, are sufficient to make out the alleged violation, it is clear that this charge was not time barred.[7]

GMAC's second line of defense, namely that it was required to suspend merit increases throughout the period of the negotiations under the mandate of NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), is also without merit. In *Katz* the Supreme Court drew a distinction between merit increases which "were in line with the company's long-standing practice of granting quarterly or semi-annual merit reviews—in effect, were a mere continuation of the status quo" and those which were not. *Id.* at 746, 82 S.Ct. at 1113. Finding that the raises in question were of the latter variety, the Court held that Katz had violated § 8(a)(5) and (1) by unilaterally granting such increases while bargaining over similar raises with the union. In the instant case, however, the Board found that GMAC's merit increase program fell within the former category. While recognizing that the company retained some discretion over whether increases would be granted to individual employees, depending upon the outcome of each individual's merit review, the Board also found that the merit increase policy, when taken as a whole, was "an existing form of compensation, and a

term and condition of employment regularly expected by the employees." Evidence in the record lends substantial support to this conclusion.[8] Given this finding, GMAC could have continued this program throughout the bargaining period without violating the Act providing it was willing to confer with the union if these raises were questioned. *See, e. g.,* H. E. Fletcher Co., 131 N.L.R.B. 474 (1961), enforcement denied on other grounds, 298 F.2d 594 (1st Cir. 1962); Southshore Packing Corp., 73 N.L.R.B. 1116 (1947). Apart from this, however, if GMAC's suspension represented merely a good faith attempt on its part to comply with its understanding of the rule in *Katz,* we would be reluctant to find a violation of the Act based upon such conduct. *See* J. J. Newberry Co. v. NLRB, 442 F.2d 897, 900 (2d Cir. 1971); NLRB v. Dorn's Transportation Co., 405 F.2d 706 (2d Cir. 1969). The instant record, however, provides little support for GMAC's claim that its motive for withholding these raises was innocent. The timing of the suspension, the company's consistent effort to shift blame to the union for the freeze, and the evidence of additional coercive conduct in the record all support the trial examiner's conclusion that GMAC "withheld the salary increases which the employees otherwise would have received, in reprisal for the

---

7. This conclusion of course distinguishes the instant case from those relied on by the company, like Bonwit Teller, 96 N.L.R.B. 608 (1951), enforcement denied on other grounds, 197 F.2d 640 (2d Cir. 1952), cert. denied, 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342 (1953) where the employer committed no unlawful conduct during the limitations period, and from our recent decision in NLRB v. Field & Sons, 462 F.2d 748 (1st Cir. 1972).

Furthermore, in light of this conclusion, it was permissible for the Board to consider evidence about events which occurred more than six months before the instant complaint was filed. While such events standing alone will not support an unfair labor practice finding, the Board may look to them "to shed light on the true character of matters occurring within the limitations period." Local Lodge No.

1424, IAM, AFL-CIO v. NLRB, 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960).

8. The company's long established policy of making these increases, the testimony of a number of field representatives that they had come to expect these raises, the large number of complaints the company received when these increases were not paid, and the company's payment of "catch-up" increases following the withdrawal of recognition all support the Board's finding. Further, we note that throughout the bargaining period the company never justified the wage freeze to the employees on the ground that it had the discretion to withhold these increases; it chose rather to use the negotiations with the union as its explanation for this policy.

unionization of this single branch of [its] world-wide nonunion operation and for the purpose of eliminating the Union."

In light of the preceding discussion, GMAC's argument that its solicitation of the letters repudiating the union was not violative of the Act merits little comment. Aside from the fact that such "shepherding" of employees in the preparation of repudiation letters, where it rises above the level of the purely ministerial, has in itself been held to be unlawful, Cumberland Shoe Co., 160 N.L.R.B. 1256 (1966); Southwestern of Dallas Optical Co., 153 N.L.R.B. 33 (1965), this conduct, when considered in the context of the unlawfully withheld merit increases, appears clearly to have been just one further step in the company's assault on the union's majority. As such, its coercive impact upon the employees' organizational rights cannot be disputed.

In evaluating the Board's bad faith bargaining finding, in light of the entire history of the negotiations, NLRB v. Reed & Prince Manufacturing Co., 205 F.2d 131, 139 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L. Ed. 391 (1953), we feel that the following facts are particularly pertinent. From the beginning of the negotiations until May 22, 1969, the parties met approximately twenty times and considered, among other things, the union's proposed contract and the company's counter-offer. In December 1970, following a seven month bargaining hiatus attributable in large part to the unavailability of the company's bargaining team, the parties met again in Puerto Rico. When the union's spokesman was unable to attend the first session, however, the company team chose to depart following a single half day meeting, informing the union that if it wished to meet again it should come to the mainland. When the union requested further bargaining on January 8, 1970, the company responded that it was willing to continue negotiating in New York. This response led the union to file unfair labor practice charges against GMAC, but these charges were subsequently withdrawn. Before the company became aware of this withdrawal, however, it responded to the union's March 9 bargaining request as follows:

"In reply to your telegram of March 9, 1970 please advise us if you are willing to withdraw at the soonest time possible your unfair labor practice charge pending before the Puerto Rico office of the National Labor Relations Board. . . . We believe that it does not conform to the realities of the circumstances to suggest negotiations while the charge is pending resolution. . . ."

Thereafter the parties met in March, April, and May. During these sessions, although the union continually requested longer and more frequent bargaining meetings, the company refused to meet more often than two or three times per month and never for any longer than four or five hours a day. By the final meeting in May the union had accepted the company's proposals on all issues except retroactivity and on this question the parties were not far apart. At the next session held on June 10, possibly because an agreement seemed imminent, the company, asserting doubt as to the union's majority status, withdrew recognition from the union and refused to bargain with it further.

On this background the Board found that by scheduling so few bargaining meetings with the union, by insisting for a time that the union come to New York for negotiations, and by conditioning further meetings on the union's withdrawal of a pending unfair labor practice charge, GMAC had not lived up to its statutory duty to bargain in good faith. We conclude that this finding was wholly appropriate. When considered in light of the suspended merit increases, the company's use of these pretexts to further delay negotiations appears to have been an integral part of its campaign to undermine the union. Under these circumstances the inference

that GMAC had not entered negotiations with an open mind and a sincere desire to reach an agreement was clearly warranted.

Finally, given our conclusion that the Board's unfair labor practice findings are amply supported by the record, GMAC may not rely on any alleged "good faith doubt" as to the union's majority status as a defense in this action since any loss in the union's majority support was directly attributable to its own unlawful conduct. *See* Franks Bros. Co. v. NLRB, 321 U.S. 702, 704–705, 64 S.Ct. 817, 88 L.Ed. 1020 (1944).

The petition to review is denied and the Board's order may be enforced.