**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALLIED PRODUCTS CORPORATION, RICHARD BROTHERS DIVISION, Respondent.**

No. 75–2124.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 6, 1976.

Decided Jan. 28, 1977.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Paul Spielberg, Richard Cohen, Washington, D. C., for petitioner.

Scott A. Lathrop, Richard L. Marcus, Adams, Fox, Marcus & Adelstein, Chicago, Ill., for respondent.

Before WEICK, EDWARDS, and McCREE, Circuit Judges.

McCREE, Circuit Judge.

The National Labor Relations Board (the Board) seeks enforcement of its order issued June 30, 1975 against Allied Products Corporation (the Company). The Board's order is reported at 218 N.L.R.B. No. 188, 1974–75 CCH NLRB ¶ 15951, 89 LLRM 1441 (1975). The Board concluded, Member Kennedy dissenting, that the Company had violated Section 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C.

§ 158(a)(1) and (5), by unilaterally suspending its previously established merit wage review program, and also by refusing to bargain with UAW Local 701 (the Union) concerning two secretarial employees who had been included in the collective bargaining unit.

The Board's order required the Company to cease and desist from unfair labor practices and from "interfering with, restraining, or coercing its employees in the exercise of rights guaranteed them in Section 7 of the Act." The Board's order also required the Company to bargain collectively and in good faith with the union. Finally, the Board ordered the Company to reinstate the merit review program formerly in effect, to apply that program "retroactively from on or about May 3, 1974," and to make whole the employees in the unit by paying them "the differences, if any, between their actual wages and the wages they would have received had the merit review program . . . not been suspended during the above period . . . ."

We agree with the Board that the Company's suspension of its merit review program was an unfair labor practice in violation of § 8(a)(1) and (5). But we do not agree with the Board's determination insofar as it includes the two confidential secretaries in the bargaining unit. Accordingly, enforcement of the Board's order concerning the two secretaries who are clearly confidential employees will be denied. The balance of the order will be enforced, with modifications.

## I. THE BOARD'S DETERMINATIONS.

The Company and the Union stipulated, and the Board agreed, that the bargaining unit consists of,

All office clerical employees employed by the Employer at its facility located at 235 East Bacon Road, Hillsdale, Michigan, but excluding all production and maintenance employees, *confidential employees*, guards and supervisors as defined in the Act, and all other employees. (emphasis added).

The Board found that on December 20, 1973, a majority of the members of the unit selected the Union as their bargaining representative. The two secretaries whose status is disputed voted in that election, but disregard of their votes would not have affected the outcome.

On July 22, 1974, the Regional Director issued a "Decision and Order Clarifying Unit" which specifically included the "secretary to the division general manager" and the "secretary to the vice president of manufacturing and physical resources" in the unit. The Regional Director found that both secretaries performed only routine, non-confidential secretarial work, that the general manager's secretary had no access to confidential mail or office files, and that, except in one instance, neither secretary ever typed or handled any correspondence dealing with contract negotiations, grievances or labor relations. He therefore concluded that neither secretary was sufficiently concerned with labor relations matters to be characterized as a confidential employee. The Board denied review.

At least since September 1974, the Company has refused to bargain with the Union regarding these secretaries. The administrative law judge (ALJ) who considered the unfair labor practice complaint did not discuss the issue whether the two secretaries were confidential employees because no new objections to the Regional Director's decision were made after the Board's earlier denial of review. The Board affirmed the ALJ's determination.

The Board also found that the Company, between 1970 and 1974, had followed a settled practice of evaluating the performance of each full-time clerical employee upon his completion of six months work. Without exception, the Company rewarded each employee so evaluated by wage increases ranging from 10 cents to 25 cents per hour. The Board determined that the wage reviews were sufficiently regular to be considered conditions of employment, and that office clerical employees regarded the reviews as an established procedure affecting compensation.

Shortly before the issuance, over the Company's objection,[1] of the Board's formal certification of the Union as the bargaining representative of the unit, the Company omitted the regular wage review of employee Rhonda Moore. It was ultimately disclosed that this action represented a deliberate and unilateral decision by the Company to suspend its merit wage review program pending a resolution of the contract negotiations with the Union. The Board concluded that this unilateral suspension of an established condition of employment without notice to and bargaining with the Union violated § 8(a)(1) and (5).

## II. THE TWO SECRETARIES WERE "CONFIDENTIAL".

The Board has for many years placed a gloss on § 2(3) of the Act,[2] holding that employees who assist and act in a confidential capacity to persons who formulate, determine and effectuate management labor relations policies are "confidential" employees and may be excluded from a bargaining unit. Although they are not themselves "managerial," they are sufficiently involved in labor relations management that they would be subjected to a potentially irreconcilable conflict of interest between their bargaining representative and their employer. *Ford Motor Co.*, 66 N.L.R.B. 1317 (1946); *B. F. Goodrich Co.*, 115 N.L.R.B. 722 (1956). We have in the past recognized the need to balance

the right of employees to be represented . . . with the right of the employer to formulate, determine and effectuate

its labor policies with the assistance of employees not represented by the union with which it deals.

*Westinghouse Elec. Corp. v. N. L. R. B.*, 398 F.2d 669, 671 (6th Cir. 1968).

*See also Illinois State Journal-Register, Inc. v. N. L. R. B.*, 412 F.2d 37 (7th Cir. 1969). Our circuit has therefore endorsed this gloss.

The Board has, with this court's approval, declined to treat secretaries as confidential unless the managers for whom they work are sufficiently engaged in labor-management negotiations to warrant exclusion of their secretaries from the benefits of collective bargaining representation. *Westinghouse, supra.* Furthermore, the secretaries must enjoy confidential status with respect to those labor relations functions. *N. L. R. B. v. Poultrymen's Serv. Corp.*, 138 F.2d 204, 210–11 (3d Cir. 1943). Finally, the Board enjoys a wide discretion in the selection of an appropriate bargaining unit, and we may not upset its determination unless it is arbitrary and capricious. *N. L. R. B. v. Mock Road Super Duper, Inc.*, 393 F.2d 432, 434 (6th Cir. 1968); *Packard Motor Co v. N. L. R. B.*, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

In spite of those precedents and recognizing the narrow scope of our review, nevertheless we have concluded that the inclusion of employees Salisbury and Rose in the bargaining unit was erroneous.

Miss Salisbury was the sole, personal secretary of Mr. Warstler, the general manager and chief labor relations administrator

---

1. The employer filed objections to the election on December 28, 1973. The Regional Director recommended that the objections be overruled on February 7 and 8, 1974. The Company filed no exceptions to the Regional Director's report; consequently, the Board adopted the Regional Director's recommendations on March 5, 1974. The first wage review was skipped on February 27, 1974.

2. § 2(3) of the Act, 29 U.S.C. § 152(3), provides,
(3) The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connec-

tion with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

of the plant. Incredibly, however, the Regional Director specifically found that "there is no evidence that Salisbury in fact assists and acts in a confidential capacity to Warstler" in his labor relations duties, that she "does not have access to Warstler's confidential mail or office files," and that "[t]here is no evidence that Salisbury has ever typed any material or had access to any [grievance or contract negotiation] information . . . ."

■ These findings were apparently based upon Salisbury's and Warstler's inability to recall, with two exceptions, any *particular* items which Salisbury had typed or seen. Warstler did testify that Salisbury had typed all labor relations paperwork he generated. That of course includes grievance or contract negotiation materials. And Salisbury never denied that fact, except that she could not recall specific items. Once an employer has demonstrated that a secretary prepares and reads labor relations materials, it need not provide a list of the particular documents that have flowed through the secretary's hands unless the charging party has at least introduced evidence which contests the general statement.

■ Similarly, Warstler testified that Salisbury opened and read all his mail except that which was labeled "confidential," and had access to all his files except the "confidential" ones. According to his testimony, files and letters were "confidential" only if they concerned company supervisors who were exempt from the coverage of the Act. Salisbury did not define the word confidential, but did say that the only mail which she did not open was that which was *marked* confidential. She therefore opened mail which appears to be confidential for the purposes of the Board's "confidential

employee" doctrine, although it was not confidential under the definition used in her office. Of course, legal rights are determined by substance and not by the labels that parties may use. *Union Planters National Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir. 1970).

■ The Board's reliance upon our opinion in *Westinghouse* to support its inclusion in the bargaining unit of Rose, the secretary of Hansbarger, is misplaced. That case intimates that the secretary of a department or division manager, who handles labor relations matters limited to his own area of managerial responsibilities, is not a confidential employee *unless the manager's responsibilities are plant-wide or company-wide.* 398 F.2d at 671. Mr. Hansbarger's managerial responsibilities extend, not only to the Richard Brothers Division plant in Hillsdale, Michigan, where his office is located, but also to the entire Allied Products Company. His company-wide responsibilities include the acquisition of plants, land and equipment; plant expansion, decentralization, closing or relocation; and subcontracting.

Although he is not directly responsible for the Company's relationship with the Union, and although he does not formulate, determine and effectuate company labor relations policy, nevertheless he does formulate, determine and effectuate company-wide management policies which critically affect labor relations.[3] Although we might regard these responsibilities standing alone as sufficient to permit the Board to conclude that Rose was a confidential employee, nevertheless they are not so clearly covered by the principles underlying the Board's view of the confidential employee

---

3. The ALJ stated that Rose "testified, without contradiction, that she never typed or handled any correspondence dealing with contract negotiations, grievances or labor relations matters." The record on appeal does not show her testimony about contract negotiations. It does show, however, that she denied typing reports about "labor relations matters" in the context of questioning about whether she had ever typed any materials about *individual* employees. She did testify that she typed reports about shutdowns, relocations and acquisitions, including Hansbarger's recommendations on these subjects. The plant managers rely heavily upon those reports in making decisions about their relations with workers in their respective plants with regard to those issues. Although Ms. Rose may not have defined "labor relations matters" in a way which included these reports, her definitions do not bind this court.

exclusion, see *Westinghouse, supra*, that its determination that Rose was not a confidential employee should be reversed as arbitrary and capricious.

However, in addition, Rose substitutes for Salisbury whenever she is absent, and we have determined that Salisbury is a confidential employee. The record does not show how often the need for substitution occurs, but it does show that Salisbury is entitled to three weeks vacation and to twelve days sick leave. Even if she took all her sick days, so that Rose would perform Salisbury's confidential duties about five weeks each year, that would also not, by itself, be sufficient to *require* the Board, in its view of the doctrine, to exclude her from the bargaining unit. See *Swift and Co.*, 129 N.L.R.B. No. 171, 47 LRRM 1195 (1961) (stenographer spends 10% of her time as substitute for confidential secretary, but is not herself confidential); *N. L. R. B. v. Swift & Co.*, 292 F.2d 561 (1st Cir. 1961) (clerk occasionally substitutes for foreman, but is not himself supervisory). However, when we consider both Rose's primary duties and her substitute ones, we conclude that they require her to be excluded from the bargaining unit.

Accordingly, we hold that the Company did not violate its duty to bargain by refusing to bargain about Salisbury and Rose.

III. THE COMPANY'S UNILATERAL DISCONTINUATION OF WAGE REVIEWS VIOLATED § 8(a)(5) and (1).

*A. The Charge Was Timely Filed.*

We are faced at the outset with the Company's contention that § 10(b) of the Act[4] bars consideration of the alleged violation. The charge was filed on October 7. Therefore, according to the Company, any violation which may have occurred before April 7 is barred by § 10(b). Because the decision to suspend reviews was made in February, and the first review was skipped on Febru-

ary 27, the Company argues that the charge was filed too late.

The record shows that on February 27, Moore was scheduled for a merit wage review, but that the review was not conducted. Early in March, Moore complained to her supervisor about the passage of her date without an increase. Instead of informing her of the new policy that had been adopted, he stated only that she should "pretend like I hadn't asked him." On March 18, Moore reported the incident at a union meeting; a union official replied that "we ought to take that up with management." On May 3, at the first bargaining session with the Company, the Union asked what the Company's merit increase practice was. The Company then, for the first time, stated that "the company's practice of granting merit increases had been suspended in light of the negotiations . . . ."

■ The Board has consistently held, with the endorsement of at least two circuits, that the six month limitation period does not begin to run until the employer's unlawful activity, which is the basis for the unfair labor practice charge, has become known to the charging party. *Russell-Newman Mfg. Co.*, 167 N.L.R.B. No. 156 (1968), enforced, 406 F.2d 1280 (5th Cir. 1969); *N. L. R. B. v. Shawnee Industries, Inc.*, 333 F.2d 221, 224 (10th Cir. 1964). This is only a specific application of the general rule that a limitation period begins to run "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [violation]." *Hungerford v. United States*, 307 F.2d 99, 102 (9th Cir. 1962), quoted in *Jordan v. United States*, 503 F.2d 620, 622 (6th Cir. 1974).

■ The Company relies, however, upon the ALJ's finding that "[International Representative] DeMott, *as he explained*, first learned that the Company had discontinued its merit wage review and/or increase *poli-*

---

4. § 10(b), 29 U.S.C. § 160(b) reads in relevant part,

 no complaint shall issue based upon any unfair labor practice occurring more than six

months prior to the filing of the charge with the Board . . . .

cy at a Union meeting held on March 18, 1974." (emphasis added). If that finding is correct, then the statute would have been tolled, if at all, only until March 18, and the unfair labor practice charge would still be barred by § 10(b). Because the Board affirmed the ALJ's findings to the extent consistent with its Decision and Order, we are bound by the finding unless we conclude that it is without substantial support on the record considered as a whole. *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The testimony which was apparently the only basis for the ALJ's finding was De-Mott's response to the following question:

[When did the union learn that the employer had discontinued its annual wage increases, *if, fact, it had?*] A. I conducted a meeting with the membership after I was assigned to the plant [, and that meeting was in March also. Later in March]. It was March 18th. And we discussed, among other things, what our demands might be. We elected officers at that meeting, and it was at that meeting that the issue was raised with me, or at least it was commented that Rhonda Moore had been by-passed for her wage review. Now, I don't recall a lot of discussion on it at that time because she had just been by-passed within a matter of a couple of weeks.

\* \* \* \* \* \*

So that issue was raised with me at that time, and my response was that we ought to take that up with the company. (emphasis added) (passages in brackets were omitted in ALJ's opinion).

■ The Company's decision to abandon the practice of conducting merit reviews was not mentioned in the answer but only in the question, and even the question made only a tentative reference. Accordingly, although of course DeMott knew that Rhonda Moore's merit review had been omitted, it cannot be inferred from his answer that he knew that there had been a

policy decision affecting all employees to abandon the existing practice.

Also revealing is DeMott's testimony:

Q. Did you know about these wage review practices?

A. *Which part? The refusal or the practices that were supposed to have gone forward?*

Q. The practices.

A. Not until probably in March sometime, no. (emphasis added).

DeMott thus clearly distinguished between his knowledge of the practice of granting performance reviews every six months, about which he learned "in March sometime," [5] and his knowledge of the omission of Moore's review and the company policy decision to abandon reviews.

Finally, DeMott stated that he first learned of the policy change at the first negotiating meeting on May 3. Both accounts of his statements at that meeting indicate that he did not know until then about the *policy* change, although he did know earlier that Moore's review had been omitted. DeMott's account was that he told the Company that he knew that "the reviews were not going forward like they had been, and . . . that I didn't see any reason why they hadn't ought to go forward." The version of Mr. Hensge, a company negotiator, also shows that De-Mott was unaware of any policy change. He said that DeMott "asked what the company's practice is with regard to merit increases . . . ." Both DeMott and Hensge agreed that Hensge responded to DeMott's question by stating that the Company had made a policy decision to discontinue the practice of conducting merit reviews.

The evidence established that the Union knew in March that the Company had failed to conduct the merit review of one employee. The evidence also established that the Union intended to encourage the Company not to change its established policy until a

---

5. It is not improbable that he might have learned about the performance review practice only in March, because he was assigned to this

bargaining unit after the organization had been completed.

new wage structure could be established by negotiations. But on the record viewed as a whole, the evidence does not support the ALJ's finding that the Union knew before April 7 that the Company had decided as a matter of policy to discontinue its established practice of conducting wage reviews of all employees.

The Company had omitted the review of only one employee's performance before April 7. Its only response before April 7 to inquiry about that omission was equivocal. That response was not adequate notice that the Company had abandoned its review practices. The evidence required the ALJ to find that neither the employee nor the Union had been informed, nor should they reasonably have discovered from the facts of which they were aware, that the Company had unilaterally decided to suspend its established practice of wage reviews. Had the ALJ made this finding, he would have concluded that the limitations period had been tolled by the Union's ignorance of facts necessary to inform it that a violation had occurred. And he would therefore not have been required to decide whether the Company's refusal to conduct later wage reviews was a continuing violation of its duty to bargain, and when the limitations period began to run.

## B. § 8(a)(1) and (5) Was Violated.

■ It is settled law that an employer may not unilaterally change its employees' wages or other working conditions when it is subject to the statutory duty to bargain with a designated representative of its employees. *N.L.R.B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *N.L.R.B. v. McCann Steel Co.,* 448 F.2d 277 (6th Cir. 1971). The Company does not contest this basic rule. It does contend, however, that because the change was not made for anti-union reasons, there was no violation. Second, the Company contends that because it might have been held to have violated the law had it either granted or denied merit increases during negotiations, it should not be penalized for a "good faith" attempt to comply with an inherently inconsistent rule.

Finally, the Company urges us to rule that because it made its unilateral change before the Union had been certified, there could have been no § 8(a)(5) violation.

■ The Company's first two arguments depend upon an erroneous interpretation of the rule against unilateral changes and of the policies upon which that rule is founded. Proof of violation of § 8(a)(5) by showing unilateral changes may not be rebutted by proof of the employer's good faith or of the absence of anti-union animus. We believe that the Company's argument is squarely refuted by *Katz:*

> Clearly, the duty thus defined may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate *in fact*—"to meet . . . and confer"—about any of the mandatory subjects. A refusal to negotiate *in fact* as to any subject which is within § 8(d), and about which the union seeks to negotiate, violates § 8(a)(5) though the employer has every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargains to that end. We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal.

369 U.S. at 743, 82 S.Ct. at 1111.

The fact that the Company offered to discuss *re-institution* of the merit increases does not mitigate its violation by unilaterally *discontinuing,* without negotiation with its employees' representative, the established merit review procedure.

■ Nor is the Company's argument, that it has "been caught between the devil and the deep blue sea," sound. It is correct that in some circumstances it will be an unfair labor practice to grant unilaterally a wage increase, e. g., *N.L.R.B. v. Katz, supra,* and that in other circumstances it will be an unfair labor practice to deny unilaterally a wage increase, e. g., *N.L.R.B. v.*

*Southeastern Michigan Gas Co.,* 485 F.2d 1239 (6th Cir. 1973). The Act is violated by a unilateral *change* in the existing wage structure whether that change be an increase or the denial of a scheduled increase. Because the Company unilaterally *changed* an existing condition of employment, instead of maintaining the status quo, the Board properly found that it had committed an unfair labor practice.

 Finally, we do not agree that an employer may freely make unilateral changes until a union has been certified as the bargaining representative of its employees. In *N.L.R.B. v. McCann Steel Co.,* 448 F.2d 277 (6th Cir. 1971), our circuit decided that the fact that an established Christmas bonus was reduced only one day after the election of the union, but before certification, did not negate violation of § 8(a)(5).[6] If the employer relies on the contention that the election was invalid when making unilateral changes,

> it does so at its own risk. If it successfully proves the election was invalid it will not be ordered to bargain . . .. But if it is unsuccessful an order by the Board based on the refusal to bargain will be enforced.
>
> *N.L.R.B. v. Laney & Duke Storage Warehouse Co.,* 369 F.2d 859, 869 (5th Cir. 1966).

It is the election—the choice of the union as the employees' bargaining representative— that gives rise to the employer's duty to bargain. An employer's objections to certification do not relieve it of that duty.

### C. This Court is Precluded from Reviewing the Remedy.

In its appearance before the administrative law judge, the general counsel requested that a status quo ante remedy be granted should the judge find that the unilateral change violated the Act. Although the judge did find a violation, he denied the requested remedy. Because the general counsel did not file cross-exceptions to the denial of a status quo ante remedy, the Company did not argue against the propriety of status quo ante. The Board, however, without notice to the Company, ordered the more stringent remedy that the general counsel had requested. The Company now urges that this remedy is barred by the holding in *N.L.R.B. v. American Insurance Co.,* 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), see also *H. K. Porter Co. v. N.L.R.B.,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), and § 8(d) of the Act, 29 U.S.C. § 158(d), and that the Board was barred by its own regulations, 29 C.F.R. §§ 102.46(b), 102.46(h), 102.48(e) from expanding a remedy ordered by the ALJ when no exceptions had been taken to it.

 However, the Company never offered the Board an opportunity to rule on those contentions. Section 10(e) of the Act, 29 U.S.C. § 160(e), pursuant to which the Board has filed the petition for enforcement which we consider in this case, provides,

> No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

This statutory provision affords the Board the opportunity to bring its labor relations expertise to bear on the problem so that we may have the benefit of its opinion when we review its determinations. See *N.L.R.B. v. Cheney Cal. Lumber Co.,* 327 U.S. 385, 389, 66 S.Ct. 553, 90 L.Ed. 739 (1946).[7]

We do not believe that the statutory "extraordinary circumstances" are present in

---

6. *Cf. King Radio v. N.L.R.B.,* 398 F.2d 14 (10th Cir. 1968): the proper way to raise objections to certification after an election is to refuse to bargain and to object to the Board's petition for enforcement of the order based on the refusal to bargain on the ground that certification was improper.

7. The record on appeal does not reveal whether the Company argued the statutory issue about the remedy before the ALJ. However, assuming that it did so argue, we believe that, particularly because the ALJ did not discuss the § 8(d) problem, the policy underlying § 10(e) required that the Board itself be given an opportunity to rule on the issue and thereby to give us the benefit of its expertise.

this case. The Board's regulations, 29 C.F.R. § 102.48(d)(1) provide,

A party to a proceeding before the Board may, because of extraordinary circumstances, move for reconsideration, rehearing or reopening of the record after the Board decision or order.

In both the statute and the regulation, the term "extraordinary circumstances" has the same, primarily procedural, meaning. Extraordinary circumstances for these purposes exist only if there has been some occurrence or decision that prevented a matter which should have been presented to the Board from having been presented at the proper time.

The Company argues that the Board has adopted sua sponte a remedy contrary to Supreme Court holdings, contrary to a statutory provision, and indeed contrary to the Board's own regulations. If that is true, then the fact that the Board acted sua sponte prevented the Company from presenting its arguments against the remedy to the Board before the Board acted. This is exactly the kind of extraordinary circumstances for which the option to move for rehearing or reconsideration is provided. See *Garment Workers v. Quality Mfg. Co.,* 420 U.S. 276, 281 n.3, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975).

However, because of the availability of a rehearing before the Board, the Board's sua sponte adoption of the status quo ante remedy is not a *statutory* extraordinary circumstance. Although the sua sponte decision did prevent presentation of the objections to the Board before its decision, it did not prevent their presentation to the Board in a petition for rehearing or reconsideration. Had the Company filed a motion for rehearing, we could have reviewed the application of the Board's expertise to this aspect of the controversy. Because the Company did not so move, we are precluded from considering its objections now.

However, because we have affirmed the Board's order based on a theory of the applicability of the § 10(b) limitations period which differs from that upon which the Board relied, we conclude that the case

should be remanded to the Board for reconsideration of the remedy in light of that determination. Of course, both the general counsel and the Company must be afforded an opportunity to present their respective positions to the Board upon such reconsideration.

## IV. CONCLUSION.

For the foregoing reasons, the portion of the Board's order which pertains to employees Rose and Salisbury must be DENIED ENFORCEMENT. The remainder of the order will be ENFORCED, except that the back pay award shall not be enforced until the Board has reconsidered the remedy in light of this opinion.

WEICK, Circuit Judge, concurring in part and dissenting in part.

I concur in that part of the majority opinion holding that the two secretaries were confidential employees and should be excluded from the bargaining unit.

I respectfully dissent from the majority opinion holding that Section 10(b) of L.M. R.A. does not bar violations occurring prior to April 7, 1974. In my opinion the decision of the Board emasculates this important statute of limitations. The Board's decision conflicts with its own decision in *Bonwit Teller, Inc.,* 96 N.L.R.B. 608 (1951), *enforcement denied on other grounds,* 197 F.2d 640 (2d Cir. 1952), *cert. denied,* 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342 (1953), as was pointed out by Member Kennedy in his dissent, and in my opinion it conflicts with the decision of the Supreme Court in *Local 1424 International Ass'n of Machinists v. NLRB,* 362 U.S. 411, 419, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), and with the decision of our Court in *NLRB v. McCready & Sons, Inc.,* 482 F.2d 872, 875 (6th Cir. 1973).

The alleged violation in the present case took place on February 27, 1974, when the company suspended its annual merit wage reviews. Its reason for doing so was that the union had not yet been certified by the Board and that this was a proper subject for consideration at collective bargaining

sessions after certification. The union did not file its unfair labor practice charge until October 7, 1974.

The Administrative Law Judge made findings of fact that the union had learned of the suspension of the annual merit wage reviews on March 18, 1974. These findings are as follows:

Here, Charging Party Union first became aware of Respondent's unilateral action on March 18, 1974. The Union, however waited until the first bargaining session on May 3 to question the Company about its suspension of this program. Union Representative DeMott explained that he waited until May 3 because he "hoped to persuade [the Company] at the bargaining table of our first session to go ahead with the reviews." [13] Manage-

13 As noted *supra*, by May 3, two employees had been denied merit reviews. One employee was denied her review on or about February 27 and the other, on or about May 2.

ment, in turn, responded to the Union by explaining why, in its view, "merit increases constitute money to be given" which should be held "in abeyance pending a resolution of the contract negotiations, in any way whatsoever." The parties discussed this and related economic subjects during their nine bargaining sessions. The Union first presented its written economic proposals on October 18. It appears that the topic of merit wage reviews was integrated directly and indirectly with the various economic proposals of the parties. Under these circumstances, I would not direct restoration of the *status quo ante* or a make-whole remedy. The parties bargained, commencing on May 3, with respect to merit wage reviews and related and integrated economic proposals. And the Union apparently chose to wait until the May 3 session to first raise this subject and until October 18 to first present its written economic proposals. Affirmative relief would, in my view, be inappropriate.[14]

14 Although the issue is not argued, it appears that Section 10(b) of the Act precludes me from finding that Respondent's February 27 wage review by-pass of employee Rhonda Moore is unlawful. The charge was filed on

October 7, 1974. Moreover, the complaint alleges that Respondent's unlawful conduct occurred on or about May 3, 1974. Cf. *General Motors Acceptance Corp., supra* [196 N.L.R.B. No. 13 (1972), *enforced,* 476 F.2d 850 (1st Cir. 1973)], *N.L.R.B. v. Katz, supra,* 369 U.S. at 746 n. 13, 82 S.Ct. 1107.

(A. 108–109)

Substantial evidence in the appendix supports these factual findings. The cross-examination of Business Agent DeMott is clear:

Q. But you made no effort from March 18th, I believe you said, when you met with the employees on March 18th— and you found out for the first time that Rhonda Moore had been by-passed—you made no effort between that time and May 3rd, when you met with the Company, to even raise the issue of the merit reviews, is that correct?

A. I believe that's correct.

Q. Was there any particular reason that you chose to wait to do that?

A. Only that I hoped to persuade them at the bargaining table of our first session to go ahead with the reviews.

Q. As part of your negotiations?

A. Yes.

(A. 100)

Q. (By Mr. Kirksey) When did the union learn that the employer had discontinued its annual wage increases, if, in fact, it had? A. I conducted a meeting with the membership after I was assigned to the plant, and that meeting was in March also. Later in March. It was March 18th. And we discussed, among other things, what our demands might be. We elected officers at that meeting, and it was at that meeting that the issue was raised with me, or at least it was commented that Rhonda Moore had been by-passed for her wage review. Now, I don't recall a lot of discussion on it at that time because she had just been by-passed within a matter of a couple of weeks.

JUDGE ITKIN: You said March 3rd, 1974, is that correct?

THE WITNESS: No. March 18th

JUDGE ITKIN: But it was in March of 1974?

THE WITNESS: Yes.

JUDGE ITKIN: March 18, 1974?

THE WITNESS: Yes, sir.

JUDGE ITKIN: Thank you.

THE WITNESS: So that issue was raised with me at that time, and my response was that we ought to take that up with the company.

\* \* \* \* \* \*

Q. Now, could you tell us what was said at this May 3d meeting regarding the annual wage increases?

A. I told Mr. Hensge that I was aware that the reviews were not going forward like they had been, and I told him that I didn't see any reason why they hadn't ought to go forward.

Q. Was there any response to your statement? The statement you just made?

A. Mr. Hensge's response was that while we were in negotiations there would be no wage reviews.

Q. Was there any further explanation from the company?

A. Only that—I believe Mr. Hensge said he didn't feel it was proper to make reviews while we were in negotiations. Or words to that effect. It was awfully close to that.

(A. 119–120)

The original charge filed on October 7th, which the Board neglected to include in the Appendix, alleged, according to counsel for the company, only that the company violated § 8(a)(3) of the Act by suspending merit increases because of union activities. The Complaint filed by the General Counsel for the Board was not based on this charge, but instead it alleged that the company's action violated § 8(a)(5) as a refusal to bargain. Undoubtedly this change was made because the good relationship which existed between the company and the union over a period of many years and in other plants, would have refuted the union's charge.

It is also not understandable why the Board reversed the Administrative Law Judge and, sua sponte, extended the remedy retroactively to the "status quo ante" existing on or about May 3, 1974. This remedy was proposed by the General Counsel before the Administrative Law Judge, but was denied by him as being inappropriate under the facts of this case. Because the General Counsel filed no exceptions to the decision of the Administrative Law Judge he is deemed by Board Rules §§ 102.-46(b) and 102.48(a) to have waived them and they cannot be urged in any further proceeding. Section 102.46(h).

The handling of this important matter summarily and without notice to the company, and without giving the company an opportunity to be heard, not only violated the Board's own rules but, to say the least, it was manifestly unfair.

The retroactive provision back to "on or about May 3, 1974" probably benefited the two employees whose merit increases were subject to review on May 2, 1974, but it appears not to embrace Rhonda Moore, whose claim was by-passed on February 27, 1974.

There may have been some good reason for the Board's basing the retroactivity to May 3d, rather than to March 18th, the date when the union acquired actual knowledge of the suspension of the annual merit wage reviews. In all probability, the reason was that a retroactive extension to March 18, 1974 would have barred all of the claims under Section 10(b). *Local 1424 International Ass'n of Machinists v. NLRB, supra; NLRB v. McCready & Sons, Inc., supra,* and *Bonwit Teller, Inc., supra.*

The duty to bargain does not arise until the bargaining representative has been certified. Prior to certification unilateral changes do not violate Section 8(a)(5) of the Act unless made in bad faith or the employer commits other violations. *Cook's Markets, Inc.,* 159 N.L.R.B. 1182 (1966). Suspension of merit increases prior to certification in the present case, so that the merit increases could be discussed and determined in collective bargaining sessions, surely did not constitute an unfair labor practice. It

was not in derogation of any rights possessed by the union.

Our decision in *NLRB v. McCann Steel Co.,* 448 F.2d 277 (6th Cir. 1971), is not apposite because in that case the company had unilaterally eliminated the customary Christmas bonus in order to disparage the union. There was no such intent in the present case.

I would deny enforcement of the entire order of the Board.