NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

Henry CAUTHORNE, an individual, t/a
Cauthorne Trucking, Respondent.

No. 81–2157.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 17, 1982.

Decided Oct. 26, 1982.

Jerrold J. Wohlgemuth, Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., N.L.R.B., Washington, D.C., were on the brief, for petitioner.

Alan D. Keiler, Washington, D.C., for respondent.

Before WRIGHT, MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case involves a petition, filed pursuant to section 10(e) of the National Labor Relations Act ("NLRA" or "Act"),[1] for enforcement of a remedial order entered by the National Labor Relations Board ("NLRB" or "Board") against Henry Cauthorne, the proprietor of a small Washington, D.C. trucking firm. We have carefully considered each of Cauthorne's many challenges to the Decision and Order of the NLRB, 256 N.L.R.B. 721 (1981), but have found no legal or factual basis for rejecting the Board's conclusion that Cauthorne violated sections 8(a)(1) and 8(a)(5) of the Act[2] by unilaterally ceasing his payments into the health and welfare fund of Drivers, Chauffeurs and Helpers Local Union No. 639 (the "Union"). Nevertheless, because we believe that, under the facts of this case, the Board may have overstepped the limits of its remedial authority in ordering Cauthorne to make whole his employees, we remand the case for a redetermination of the period for which the terminated benefits must be restored.

## I. BACKGROUND

The bargaining relationship at issue commenced in 1972, when Cauthorne signed a collective bargaining agreement with the Union, executed Health and Welfare and Pension Fund Trust Agreements, and began making payments into the trust funds on behalf of his employees. Although that initial agreement expired in 1975 and Cauthorne did not sign a new contract, "substantial evidence on the record considered as a whole,"[3]—including Cauthorne's continued and faithful adherence to the trust agreements—supports the Board's conclusion that he was bound by the 1975–1978 contract between the Construction Contractors Council, Inc. and the Union.

Shortly before the expiration date of the 1975–1978 contract, Union representatives approached Cauthorne to discuss a new agreement. Cauthorne initially indicated that he would not sign another contract, but then met with Union officials on several occasions. These meetings were apparently unproductive, for Cauthorne never signed a new contract, and he terminated his trust fund contributions when the 1975–1978 contract expired on July 31, 1978. Between July 1978 and January 1979: Cauthorne conferred by telephone at least once with the Union's president; the Union filed a section 8(a)(5) refusal to bargain charge that was subsequently dismissed; and the parties exchanged several exploratory letters. These contacts finally culminated in a meeting between a Union business agent and Cauthorne's attorney on January 30, 1979. The participants' accounts of this negotiation session diverge sharply, but their testimony makes clear that continued negotiations were unlikely to shrink the gap between the parties' positions. Transcript of Proceedings before NLRB ("Tr.") 213, 222–23.

During the post-January 30, 1979 communications between the parties, the Union's representative initiated a series of letters by demanding the addresses of Cauthorne's employees, requesting a counterproposal, and asserting that "we will not serve any useful purpose by prolonging our negotiations." Respondent's Exhibit ("R.E.") 14. In response to Cauthorne's request for "a new proposal to break the impasse," R.E. 15, the Union sent a copy of its original proposal, R.E. 16; Tr. 214–16. Cauthorne's attorney then provided the Union with a mailing list, R.E. 18, and, on May 10, 1979, a counterproposal, R.E. 19, but never received any response from the Union, Tr. 214.

## II. DISCUSSION

Without considering whether the parties had reached an impasse in the communications that followed the January 1979 meeting, the NLRB ordered Cauthorne to pay "all health and welfare trust fund contributions, as provided in the expired collective-bargaining agreement, ... until ... [he]

---

**1.** 29 U.S.C. § 160(e) (1976).

**2.** 29 U.S.C. §§ 158(a)(1) & (5) (1976).

**3.** 29 U.S.C. § 160(e) (1976).

negotiates in good faith to a new agreement or to an impasse." 256 N.L.R.B. at 723. Because we believe that Cauthorne's liability may well have terminated during the first half of 1979, further consideration of the scope of the Board's Order is necessary.

### A. Introduction: The General Prohibition Against Unilateral Changes in Conditions of Employment

Under the NLRA, it is clear that an expired collective bargaining agreement continues to define the status quo as to wages and working conditions, and that "[t]he employer is required to maintain that status quo . . . until the parties negotiate to a new agreement or bargain in good faith to impasse." NLRB v. Carilli, 648 F.2d 1206, 1214 (9th Cir. 1981); see Hinson v. NLRB, 428 F.2d 133, 137 (8th Cir. 1970) (per curiam). In most cases, the Board and courts have held that an employer's implementation of a pre-impasse unilateral change in established wages or working conditions, over which bargaining is required, will constitute a violation of section 8(a)(5). Such breaches of the duty to bargain are typically remedied by make-whole orders, whereby the offending employer is required to pay his employees the wages or benefits that they would have received but for the unlawful unilateral action. In the usual case, no substantial bargaining has occurred between the parties after the employer's unilateral change; consequently, the typical make-whole order runs from the date of the unilateral change until the employer and union negotiate a new agreement or reach an impasse. It is less clear, however, what type of remedial order is appropriate in a case where the employer and union have engaged in substantial bargaining subsequent to the occasion of the unilateral change.

### B. The Appropriate Remedy In a Case Involving a Unilateral Change Followed By a Bargaining "Impasse"

In cases involving a violation of section 8(a)(5) based on an employer's unilateral alteration of existing benefits, it is the Board's established policy to order restoration of the status quo ante to the extent feasible, and in the absence of evidence showing that to do so would impose. an undue or unfair burden upon the respondent.

Allied Products Corp., Richard Brothers Division, 218 N.L.R.B. 1246, 1246 (1975), enforced in part, 548 F.2d 644 (6th Cir. 1977). At least implicit in the holding of Allied Products, and other Board and court decisions dealing with unilateral changes, is the principle that an impasse reached following a unilateral change marks the end of the period for which back pay may be awarded. To hold otherwise would be patently unfair.

Allied Products arguably can be read to suggest that an employer who has instituted a unilateral change in his employees' wages or working conditions cannot cure his violation by subsequently bargaining to an impasse. See id.; NLRB v. Allied Products Corp., Richard Brothers Division, 548 F.2d 644, 652 (6th Cir. 1977). We do not read the case so broadly. An employer's unilateral change in wages or benefits conclusively evinces a refusal to bargain under section 8(a)(5) of the Act, but one cannot define the appropriate measure of the remedy merely by referring to that change. On this score, we reject any presumption that an employer's unfair labor practice automatically precludes the possibility of meaningful negotiations and prevents the parties from reaching a good faith impasse. Not only is such a presumption highly speculative, see Rayner v. NLRB, 665 F.2d 970, 978 (9th Cir. 1982), but it is also an impermissibly punitive justification for continuing liability when good faith negotiations between the parties have exhausted the prospects of concluding an agreement. Cf. id. at 976–78 (rejecting Board's conclusion that bargaining against a background of unremedied unfair labor practices would have been "an exercise in futility").

In designing a remedy in a section 8(a)(5) case, a crucial variable is the duration of the refusal to bargain. See R. Gor-

MAN, BASIC TEXT ON LABOR LAW 533 (1976).[4] If the refusal persists until the time of the Board's order, continuous make-whole relief may be appropriate. But if bargaining was resumed and carried forward to an impasse at some point between the initial refusal and the time of the Board's order, make-whole relief must be circumscribed—at least in cases where the unilateral change did not violate the terms of a valid collective bargaining agreement. We hold, therefore, that where an employer and a union have bargained in good faith,[5] despite the employer's prior unilateral changes in wages or conditions of employment, the employer's ongoing liability for the unlawful unilateral changes terminates on the date when the parties execute a new agreement or reach a lawful impasse.

■ The record in this case indicates that the parties may have reached an "impasse" in their negotiations sometime during the first half of 1979. Because the Board's failure to consider this possibility may have produced a substantial injustice, we remand the case with an instruction that Cauthorne's ongoing make-whole liability would terminate on the date the parties reached an impasse. Upon remand, if the Board finds that the parties bargained to an impasse, then the Order must be modified.

4. "The period for which backpay is computed normally ... runs until ... the employer 'cures' its wrongdoing, by either beginning to bargain with the union or actually offering the employees reinstatement." *Id.* (discussing unilateral cessation of operations).

5. Whether a party has bargained in good faith should be assessed under the totality of the circumstances test. *See Pittsburgh-Des Moines Co. v. NLRB,* 663 F.2d 956, 959 (9th Cir. 1981); *Glomac Plastics, Inc. v. NLRB,* 592 F.2d 94, 98 (2d Cir. 1979). The question is not purely factual, *see Local 13, Detroit Newspaper Printing & Graphic Communications Union v. NLRB,* 598 F.2d 267, 272 (D.C.Cir.1979), but we have recognized that its resolution is largely a matter for the Board's expertise, *see United Packinghouse, Food & Allied Workers Int'l Union v. NLRB,* 416 F.2d 1126, 1131 (D.C.Cir.), *cert. denied sub nom. Farmers' Coop. Compress v. United Packinghouse, Food & Allied Workers Int'l Union,* 396 U.S. 903, 90 S.Ct. 216,

### III. CONCLUSION

For the foregoing reasons, we grant enforcement in part and deny it in part. The case is remanded to the Board for a redetermination, in accordance with the record evidence and pursuant to the principles enunciated in this opinion, of the period for which Cauthorne must contribute to the Union's health and welfare trust fund.

*So ordered.*

24 L.Ed.2d 179 (1969). We take this opportunity to observe, however, that an employer's unilateral change in wages or working conditions, while perhaps constituting some evidence concerning the good faith of his subsequent overtures, is not dispositive. We would also note that an employer's adamant insistence on pro-management terms does not alone demonstrate bad faith, *see NLRB v. Pacific Grinding Wheel Co.,* 572 F.2d 1343, 1348 (9th Cir. 1978), and that neither side is required to agree to a proposal or make concessions, *see Sign & Pictorial Union Local 1175 v. NLRB,* 419 F.2d 726, 731 (D.C.Cir.1969). To support a finding of bad faith, in short, the Board must point to evidence that the party's attitude was inconsistent with its duty to seek an agreement, *see Seattle-First Nat'l Bank v. NLRB,* 638 F.2d 1221, 1226 (9th Cir. 1981); thus, an employer's prior refusal to bargain, standing alone, cannot satisfy this requirement.