**SOUTHWEST FOREST INDUSTRIES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 86–7137, 86–7177.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 6, 1987.

Decided March 1, 1988.

John H. Stephens, Cox, Castle & Nicholson, Los Angeles, Cal., for petitioner.

Howard E. Perlstein, NLRB, Washington, D.C., for respondent.

Before BROWNING, Chief Judge, FLETCHER and POOLE, Circuit Judges.

FLETCHER, Circuit Judge:

Southwest Forest Industries Inc. (Southwest) petitions for review of an unfair labor practice order issued by the National Labor Relations Board (the Board). The Board cross-applies for enforcement of its order. The Board found that Southwest had violated sections 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1) and (5), in unilaterally

implementing changes in terms and conditions of employment. The Board ordered the reinstatement of the *status quo ante* until the parties bargained in good faith to impasse. We enforce the Board's order.

## BACKGROUND

Graphic Communications Union District Council # 1, Local 388 (the Union) and Southwest mutually agreed to extend their collective bargaining agreement beyond its June 15, 1983 termination date, subject to cancellation on 30 days notice by either party. On August 22, 1983, the Union notified Southwest that it would terminate the collective bargaining agreement effective September 23.[1] After unsuccessful negotiations in August and September, all employees went out on strike on September 23.

On November 23, Southwest contacted the federal mediator and asked him to arrange a meeting with the Union. The mediator contacted the Union but was advised that the Union would not agree to meet unless Southwest dropped its proposals on union security and health care. The Board's General Counsel concedes that as of November 23 the parties were at an impasse. On November 28, Southwest delivered a letter to the Union, notifying it of Southwest's intent to hire permanent replacements, proposing a wage reduction in some job classifications, and suggesting that it would also make unspecified changes in job conditions. The Union did not contact Southwest in response to this letter. Most striking employees, however, reported for work on November 30.

On December 2, Southwest delivered an "Interim Policy Manual" (IPM) to the Union without an explanatory cover letter. Most of Southwest's employees received a copy of the IPM on December 5, the same date on which Southwest implemented the IPM. The employment conditions described in the IPM differed significantly from those under the expired collective bargaining agreement and from Southwest's previous proposals to the Union.[2] The Union did not request a delay in the implementation of the IPM or request bargaining over the changes set forth in the IPM. Rather, on December 6, the Union filed unfair labor practices charges with the Board based on Southwest's failure to negotiate prior to implementing the changes.

On February 3, 1984, the Regional Office of the NLRB informed Southwest that it would file a complaint against it. At a meeting on February 4, 1984, Southwest asked the Union to state its position with respect to the changes reflected in the IPM. The Union refused to do so because it had not seen the unfair labor practice complaint. At a meeting on March 15, 1984, the Union offered to negotiate a settlement of the unfair labor practice complaint, but refused to negotiate the changes contained in the IPM. Southwest has made several subsequent offers to negotiate, but the Union has not responded.

An Administrative Law Judge (ALJ) heard the charge on October 2, 1984. The ALJ found that Southwest violated sections 8(a)(1) and (5) of the Act in its unilateral implementation of changes in terms and conditions of employment without first af-

---

1. All dates refer to the calendar year 1983, unless otherwise noted.

2. The IPM differed from Southwest's previous proposal in the following respects:
   (a) The IPM made no provisions for the position of working foreman.
   (b) The IPM made no provision for the position of pallet hard forklift operator and pallet yard helper.
   (c) The IPM provided for a reduced hourly wage rate for employees in the bundler position.
   (d) The IPM provided for reduced hourly wage rates for employees in unskilled classifications.
   (e) The IPM contained a new management's rights policy.
   (f) The IPM reduced the number of paid holidays.
   (g) The IPM provided for a new industrial injury policy.
   (h) The IPM did not provide for union bulletin boards, union representatives, shop committees, grievance committees and joint conciliation committees.
   (i) The IPM changed the method for computing overtime for employees.
   (j) the IPM changed the vacation policies.

fording the Union an opportunity to bargain. The ALJ did not order a *status quo ante* remedy because he concluded that "irrespective of any opportunity to bargain, the Union would not have resumed bargaining." Both parties filed exceptions to the ALJ's decision. The Board affirmed the ALJ's finding that Southwest had violated sections 8(a)(1) and (5) of the Act, but modified the ALJ's order by requiring a restoration of the *status quo* from December 1983 until such time as the parties bargain in good faith to a new agreement or impasse. Southwest filed a timely petition for review, and the Board timely cross-petitioned for enforcement of its order.

## STANDARD OF REVIEW

On review in this court, the National Labor Relations Board's findings of fact are conclusive if supported by substantial evidence on the record considered as a whole. *NLRB v. Auto Fast Freight, Inc.*, 793 F.2d 1126, 1128 (9th Cir.1986); 29 U.S.C. § 160(e). "The Board's [remedial] order will not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964) (quoting *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218–19, 87 L.Ed. 1568 (1943)).

## DISCUSSION

I. *Refusal to Bargain Violation*

■ Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." Until the parties bargain to an impasse, an employer's unilateral change in the terms and conditions of employment constitutes a refusal to bargain. *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); *Auto Fast Freight*, 793 F.2d at 1129. An employer must maintain the *status quo* after the expiration of the collective bargaining agreement until a new

agreement is reached or until the parties bargain in good faith to impasse. *NLRB v. Carilli*, 648 F.2d 1206, 1214 (9th Cir.1981). Where, as in this case, an impasse is reached, "the employer may unilaterally impose changes in the terms of employment *if* the changes were reasonably comprehended in the terms of its contract offers to the union." *Cuyamaca Meats, Inc. v. San Diego & Imperial Counties Butchers' & Food Employers' Pension Trust Fund*, 827 F.2d 491, 496 (9th Cir.1987) (emphasis added). Unilateral changes not comprehended in pre-impasse proposals constitute a refusal to bargain in violation of sections 8(a)(5) and (1) of the Act. *Id.; Peerless Roofing Co. v. NLRB*, 641 F.2d 734, 735 (9th Cir.1981).

■ It is undisputed that the changes made by Southwest were not on the bargaining table prior to impasse. Southwest contends, however, that the Union failed to respond to any of its bargaining overtures after receiving notice of the changes and that this failure resulted in a waiver of the Union's statutory right to bargain prior to implementation. The Union cannot be found to have waived its bargaining rights unless the notice it received provided adequate time to consider and respond to Southwest's proposals. *See M.A. Harrison Mfg. Co.*, 253 NLRB 675, 676 (1980), *enf'd*, 682 F.2d 580 (6th Cir.1982) (three day interval between announcement and institution of unilateral change inadequate opportunity to bargain); *City Hospital of E. Liverpool, Ohio*, 234 NLRB 58, 59 (1978) (three weeks notice sufficient).

■ Substantial evidence in the record before the Board supports the Board's finding that Southwest did not afford the Union a meaningful opportunity to bargain about the changes before instituting them. The only change that Southwest's previous proposal—contained in its letter of November 28, 1983—set forth specifically was Southwest's intent to revise the existing wage rates for unskilled employees. Southwest first announced the numerous changes at issue here in the IPM that it delivered on December 2 and implemented

on December 5. The IPM was 18 pages long and did not readily reveal what proposals, if any, differed from Southwest's previous offer.

In light of the many changes proposed in the IPM, three days notice was insufficient notice to permit Southwest unilaterally to implement the changes. The Board could reasonably conclude that the Union did not have adequate notice of the changes Southwest wished to implement to formulate a response. Because Southwest did not provide the Union with the opportunity to bargain, *see Auto Fast Freight*, 793 F.2d at 1131, the Union's failure to act did not constitute a waiver of its right to bargain under the Act. *See Stone Boat Yard v. NLRB*, 715 F.2d 441, 444 (9th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). Accordingly, we affirm the Board's finding that Southwest's implementation of unilateral changes in the terms of employment violated sections 8(a)(5) and (1) of the Act.

## II. *Status Quo Ante Remedy*

When an employer violates section 8(a)(5) in unilaterally altering conditions of employment, the Board typically orders a restoration of the *status quo ante* running from the date of the violation until such time in the future as the parties negotiate in good faith to a new agreement or an impasse. *NLRB v. Cauthorne*, 691 F.2d 1023, 1025 (D.C. Cir.1982). Here, however, the ALJ determined that a make-whole remedy was not appropriate based on his finding that, even absent Southwest's unfair labor practice, the Union would not have resumed bargaining. The Board rejected the ALJ's finding as "purely speculative" and ordered the *status quo* restored.

We find no basis for disagreement with the Board. It is by no means certain that, had the Union been given sufficient notice of Southwest's planned changes, it would have sat passively by rather than exercising its right to negotiate. The fact that an impasse had been reached in November 1983 over the issues of union security and health care does not support the conclusion that the Union would have refused to discuss other proposed changes,

particularly when its refusal could permit unilateral implementation. *See Auto Fast Freight*, 793 F.2d at 1129. Furthermore, the record shows that, on February 10, 1984, the Union indicated its willingness to reopen negotiations following resolution of the unfair labor practice dispute. We conclude that substantial evidence supports the Board's finding that the question of whether the Union was willing to reopen negotiations is amenable only to speculation.

Southwest contends that the Board's remedial order is at odds with Circuit Court precedent. The first case Southwest cites is *Rayner v. NLRB*, 665 F.2d 970 (9th Cir.1982). In *Rayner*, the employer, which had never adhered to the terms of its collective bargaining agreement, notified the Union more than three months prior to the agreement's expiration that it was willing to negotiate a new contract. 665 F.2d at 973. The Union rejected the offer to negotiate. *Id.* This court refused to enforce the portion of the Board's remedy that held the employer to the terms of the expired contract past its expiration date. This was because the employer had given timely notice that the contract would terminate and that the agreement would be modified. *Id.* at 977. *Rayner* stands for the proposition that a union may waive its right to bargain if it fails to respond to good faith bargaining overtures, provided the opportunity for response is adequate. Certainly three months notice is sufficient. What distinguishes this case from *Rayner* is the fact that Southwest did *not* provide the Union with timely notice or the opportunity to negotiate the post-expiration modifications. *Reynor*, thus, is inapposite here.

Second, Southwest relies on *NLRB v. Cauthorne*, 691 F.2d 1023 (D.C. Cir.1982). The *Cauthorne* court held that if, *following* an employer's illegal unilateral action, the parties bargain to impasse, restoration of the *status quo* may not be ordered beyond the date impasse is reached. 691 F.2d at 1026. The court distinguished the facts in *Cauthorne* from the "usual case" in which "no substantial bargaining has occurred between the parties after the employer's unilateral change," and in which "consequently the typical make-whole or-

der runs from the date of the unilateral change until the employer and union negotiate a new agreement or reach an impasse." *Id.* at 1025. *Cauthorne* only serves to support the Board's order here, for this is the "usual case." Southwest and the Union engaged in no substantial bargaining following the unilateral changes and thus could not have reached an impasse. The remedy ordered by the Board is the one *Cauthorne* approves under these circumstances.

The Board's power to restore the *status quo ante* as a means to ensure meaningful bargaining is well recognized. *See Fibreboard Paper Prods. Corp.*, 379 U.S. at 217, 85 S.Ct. at 406. Indeed, to deny the Union a make-whole remedy would permit Southwest "to retain the fruits of unlawful action" and render the guarantees embodied in the National Labor Relations Act "meaningless." *NLRB v. Warehousemen's Union Local 17*, 451 F.2d 1240, 1243 (9th Cir. 1971). In sum we find that the Board's order is supported by substantial evidence and serves to effectuate the policies of the Act. Accordingly, the Southwest's petition for review is DENIED, and the Board's cross-application for enforcement is GRANTED.