73 F.3d 406
 151 L.R.R.M. (BNA) 2242, 315 U.S.App.D.C.
306, 64 USLW 2512
 DAILY NEWS OF LOS ANGELES, a Division of Cooke Media Group,
Inc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Los Angeles Newspaper Guild, Local 69, AFL-CIO, Intervenor.
 No. 95-1047.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 6, 1995.
Decided Jan. 19, 1996.
 
 Thomas P. Burke argued the cause, for petitioner, with whom Jamie L. Johnson was on the briefs.
 David A. Fleischer, Senior Attorney, argued the cause, for respondent, with whom Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on the brief. Paul J. Spielberg and Ellen Greenstone entered appearances.
 Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.
 Opinion for the Court filed by Chief Judge EDWARDS.
 Dissenting opinion filed by Circuit Judge HENDERSON.
 HARRY T. EDWARDS, Chief Judge:
 
 
 1
 Between 1986, when the Daily News ("Company") purchased its daily newspaper operation, and 1989, when the National Labor Relations Board ("NLRB" or "Board") certified the Los Angeles Newspaper Guild, Local 69, AFL-CIO ("Guild" or "Union"), as the collective bargaining representative of the Company's editorial employees in Washington, D.C. and eight locations in California, the Company followed its predecessor's policy of giving annual merit increases to employees in the editorial department. However, following the Union's certification, the Company unilaterally decided to terminate its practice of granting merit increases. In response, the Guild filed a complaint with the NLRB.
 
 
 2
 The Board determined that the Daily News had unlawfully refused to bargain, in violation of section 8(a)(5) of the National Labor Relations Act ("NLRA" or "Act"),[1] by discontinuing the merit-increase policy without first negotiating to impasse with the Guild. The Board rejected the Company's argument that the wage increases were totally discretionary, and, therefore, could be terminated at any time. Instead, the Board ruled that the program of granting annual, merit-based wage increases based on performance evaluations had become a fixed term or condition of employment that could not be discontinued except pursuant to negotiations with the Union. On the basis of this finding of an unfair labor practice, the Board ordered the Daily News to award employees back pay representing the difference between their current salaries and the approximate amount of their salaries absent the unlawful termination of the merit-increase policy.
 
 
 3
 On appeal, the Company contends that the Board's decision should be reversed because a discretionary program can never become a fixed term or condition of employment. However, the Company's argument is misguided in suggesting that a term or condition of employment can never be a mandatory subject of bargaining so long as it carries the appellation "discretionary." Indeed, the proper analysis in a case such as this one does not begin with the label assigned to a particular employee benefit, but, rather, with the character of the program at issue. Here, the Board found that the Company had an established practice of annually evaluating the merit of each employee based upon standard performance evaluations, and then determining an appropriate increase based only on the merit criterion. The program was in no sense whimsical, for each employee was assured an annual evaluation and a merit increase if his or her evaluation warranted it. The only discretion retained by the Company was with respect to the amount of the increases to be given to employees who earned good evaluations. Thus, the Board properly determined that the Company could not discontinue the entire program based on non-merit considerations, at least not without first negotiating with the Guild. Because there is substantial evidence in the record as a whole to support the Board's findings, and because we find no infirmity in the legal analysis underlying the Board's judgment, the Company's petition for review is denied, and the Board's cross-application for enforcement is granted.
 
 I. BACKGROUND
 A. The Dispute
 
 4
 On January 1, 1986, the Daily News took over the operation of a daily newspaper it had purchased from another company, the Valley News. At that time, the Company adopted its predecessor's policy of annually evaluating the performance of each editorial department employee on or about the anniversary of the employee's date of hire or last promotion, and using the performance review as the basis for increasing salaries. These merit increases could range from no increase to a substantial raise, depending upon the employee's evaluation.
 
 
 5
 Although the amount of the increase was discretionary, the timing of the reviews was fixed, and the sole criterion for determining the amount of the increase was merit (except for those employees who had already reached the top pay for their job classification). Moreover, a vast majority of all eligible employees received some kind of raise each year. For example, in 1986, 81.5% of the employees who received performance evaluations received merit raises; in 1987, 82.7% received merit raises; and in 1988 and the first five months of 1989, 89% received merit raises.[2] Petitioner/Cross-Respondent's Appendix ("P.A.") 430-31.
 
 
 6
 On May 8, 1989, the Board certified the Guild as the collective bargaining representative for all of the Company's full-time and regular part-time editorial department employees in Washington, D.C. and at eight locations in California. Bargaining negotiations between the Guild and the Company commenced on June 14, 1989. The parties agreed to defer bargaining on economic issues until all non-economic issues had been negotiated. Company negotiator Tom Burke also stated that, pending negotiations, the Company did not intend to continue with the merit program. P.A. 427. The Guild's Administrative Officer, James Smith, stated that he considered the salary increases to be an existing condition of employment that the Company could not unilaterally discontinue, and that, during the course of bargaining, the Daily News should continue to grant the increases to all employees on their anniversary dates. Burke replied that the Company would continue to consider whether it would discontinue the increases during the course of bargaining. Id. at 427-28.
 
 
 7
 Sometime after the June 14 bargaining session, the Daily News decided that it would not give any raises to employees who were part of the collective bargaining unit ("unit employees"). The Company concedes that this decision was not based on any merit determinations regarding the individual employees. Indeed, at least two unit employees were informed at their annual performance appraisal that, based on their performance, they would have received increases, but that the Company would not give raises because of the Union negotiations. Tr. of Hearing (Dec. 12, 1989) 27, 33-34, reprinted in P.A. 148, 154-55.
 
 
 8
 At the second bargaining session, held on July 5, 1989, Burke announced that the Company had decided to discontinue granting merit raises to unit employees. The Company did, however, continue to issue annual performance appraisals to all employees, and also continued to grant merit increases to those employees outside of the collective bargaining unit.
 
 B. The Board's Initial Conclusions
 
 9
 The Guild filed a complaint with the NLRB, which issued a Decision and Order on August 27, 1991. Daily News of Los Angeles, 304 N.L.R.B. 511, 1991 WL 171476 (1991) ("DNLA I "). The Board found that the merit-increase program, although discretionary as to the precise amount of each individual increase, had nevertheless become a fixed term or condition of employment that, pursuant to NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), could not be changed without bargaining. While acknowledging the Company's discretion in setting the amount of any raises, the Board nevertheless determined that the Company was not free to discontinue the policy, and so was required to continue its prior practice of giving unit employees increases based on individualized merit assessments. Id. at 511.
 
 
 10
 Further, the Board rejected the Company's argument that the Guild had waived any possible objections to changes in the increase program by agreeing to the employer's exercise of discretion in granting the increases. The Board ruled that the Guild had only agreed to the exercise of discretion concerning the amount of the raises, but did not waive an objection to the discontinuance of the entire program. Id.
 
 
 11
 Accordingly, the Board determined that the Company had violated section 8(a)(5) of the NLRA by unilaterally withholding the annual merit increases from employees. The Board ordered the Company to cease and desist from this unfair labor practice and to make the unit employees whole for any monetary losses sustained because of the Company's unlawful conduct. Id. at 516.
 
 C. Previous Proceedings Before This Court
 
 12
 On appeal, this court questioned whether the Board's core holding might be inconsistent with prior Board precedent. The court noted that, in other cases where there has been "an established pattern of increases that [was] fixed as to timing but discretionary as to amount," the Board has appeared to treat such programs as lacking the character of an established practice. Daily News of Los Angeles v. NLRB, 979 F.2d 1571, 1575 (D.C.Cir.1992). Of particular concern to the court was the Board's decision in Anaconda Ericsson Inc., 261 N.L.R.B. 831, 1982 WL 24497 (1982). The court also noted that the Supreme Court's decision in Katz, on which the Board had relied, did not necessarily dictate the result reached by the Board because Katz only addressed the case of an employer who unilaterally decides to give a discretionary merit wage increase, whereas, in this case, the Daily News was attempting to discontinue its policy. See 979 F.2d at 1573. Accordingly, the court remanded the case so that the Board could reconsider and more fully explain its apparent failure to follow Anaconda Ericsson and its application of Katz in a situation involving the discontinuance of merit increases. 979 F.2d at 1576.
 
 
 13
 The court, sua sponte, also invited the Board to address two additional issues on remand. First, the court asked how the Board could justify a back pay remedy for failure to grant discretionary wage increases when the amount of the increase each employee would have received was "by hypothesis ... unascertainable." Id. at 1577. Second, the court questioned whether the prohibition on wage and benefit decreases during negotiations was consistent with the Supreme Court's decisions in NLRB v. Insurance Agents' International Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), and American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), which impose limits on the Board's authority to find unlawful either party's choice of economic weapons in aid of its bargaining position. 979 F.2d at 1577-78.
 
 D. The Board's Decision on Remand
 
 14
 The Board held on remand that, under Katz, any unilateral change covering a mandatory subject of bargaining is unlawful regardless of the nature of the change or the particular term or condition affected. Daily News of Los Angeles, 315 N.L.R.B. 1236, 1237-38, 1994 WL 731261 (1994) ("DNLA II "). The Board further noted that it had consistently applied Katz to find the unilateral discontinuance of merit raises to be unlawful whenever such raises had become established terms or conditions of employment. Id. at 1239-40. Agreeing that Anaconda Ericsson could not be reconciled with other Board decisions, however, the Board overruled it. Id. at 1241.
 
 
 15
 The Board also pointed out that a back pay award need only be based on an approximation of the amount lost, not an exact determination. The Board concluded that, in this case, an approximation could be reached, using such information as the past annual reviews of the unit employees, the merit increases given to unrepresented employees with similar reviews, and the amounts of the increases for unit employees in previous years. Thus, the Board concluded, its remedial order would make possible the calculation of a proper back pay award for each affected employee. Id.
 
 
 16
 Finally, the Board rejected the Company's argument that discontinuing the merit-increase program was a legitimate economic weapon protected under Insurance Agents' and American Ship. According to the Board, those cases only apply to parties that are engaged in lawful, good-faith bargaining. Therefore, because a unilateral change in a term or condition of employment is itself a violation of the duty to bargain, the Board reasoned that the Company's change could not be a lawful economic weapon. Accordingly, the Board reaffirmed its finding of a violation and its prior remedial Order. Id. at 1242-43.
 
 II. ANALYSIS
 
 17
 Sections 8(a)(5) and 8(d) of the NLRA require parties in a collective bargaining relationship to negotiate in good faith over "wages, hours, and other terms and conditions of employment." 29 U.S.C. Sec. 158(d) (1988). However, this duty applies only to those areas that are considered to be mandatory subjects of bargaining. See NLRB v. Borg-Warner Corp., 356 U.S. 342, 349-50, 78 S.Ct. 718, 722-23, 2 L.Ed.2d 823 (1958). Therefore, as an initial matter, we must determine whether the merit-increase program at issue in this case is, in fact, a mandatory bargaining subject. Because the program involved employee wages, we have no difficulty concluding that it was. See, e.g., NLRB v. McClatchy Newspapers, Inc., 964 F.2d 1153, 1161 (D.C.Cir.1992) (per curiam) ("[M]erit pay is a mandatory subject of bargaining....") (Edwards, J., concurring). Indeed, the Daily News does not dispute this point.
 
 
 18
 Given that the merit-increase program was a mandatory subject of bargaining, we next turn to the question of whether the program was impermissibly changed. The Supreme Court, in Katz, held that an employer violates the duty to bargain by unilaterally changing a term of employment with respect to a mandatory subject of bargaining during the course (or in the absence) of negotiations. 369 U.S. at 743, 82 S.Ct. at 1111. Such a change constitutes "a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy." Id. at 747, 82 S.Ct. at 1114; see also NLRB v. Cauthorne, 691 F.2d 1023, 1025 (D.C.Cir.1982) (The court noted that an employer's implementation of a pre-impasse unilateral change in established wages or working conditions, over which bargaining is required, will generally constitute a violation of section 8(a)(5).).
 
 
 19
 As the Board correctly explained in its supplemental decision, it makes absolutely no difference under Katz whether the change at issue adds to or subtracts from employees' wages, or whether it institutes a new employment policy or withdraws one that already exists. Thus, "in some circumstances it will be an unfair labor practice to grant unilaterally a wage increase, and ... in other circumstances it will be an unfair labor practice to deny unilaterally a wage increase. The Act is violated by a unilateral change in the existing wage structure whether that change be an increase or the denial of a scheduled increase." NLRB v. Allied Prods. Corp., 548 F.2d 644, 652-53 (6th Cir.1977) (citations omitted); see also NLRB v. Dothan Eagle, Inc., 434 F.2d 93, 98 (5th Cir.1970) ("The cases make it crystal clear that the vice involved in both the unlawful increase situation and the unlawful refusal to increase situation is that the employer has changed the existing conditions of employment. It is this change which is prohibited and which forms the basis of the unfair labor practice charge."). The dissent misreads this clear and well-established rule from Katz, and therefore misses the mark. It cannot be doubted that, under the prevailing case law from the Supreme Court, the circuit courts, and the Board, the relevant inquiry here is whether any established employment term on a mandatory subject of bargaining has been unilaterally changed.
 
 
 20
 In conducting this inquiry, we must sustain the factual findings of the Board so long as substantial evidence exists in the record to support them. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951). Moreover, as the Supreme Court has made clear, "because the classification of bargaining subjects as terms or conditions of employment is a matter concerning which the Board has special expertise, its judgment as to what is a mandatory bargaining subject is entitled to considerable deference." Ford Motor Co. v. NLRB, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979) (citation and internal quotations omitted).
 
 
 21
 A. The Company Changed a Fixed Term or Condition of Employment
 
 
 22
 The Daily News argues that the merit-increase program was fully discretionary, leaving the Company free to discontinue the program at will without violating Katz. The Board's findings do not support the Company's contentions.
 
 
 23
 The decision of the Administrative Law Judge ("ALJ"), incorporated by the Board, states that, under the merit-pay program, the "salary increase, if any, is based on merit, and may range from no increase to a substantial increase depending on the perceived efforts and ability of the employee, and his or her value to the newspaper. The amount of the increase, if any, is totally discretionary." DNLA I, 304 N.L.R.B. at 514 (emphasis added). Thus, while acknowledging that the employer exercised discretion in deciding the amount of each increase, the ALJ made clear that employees routinely received annual reviews for the purpose of merit-based pay increases, and that an individual assessment of merit was the sole basis for determining the amount of an employee's increase. Similarly, in its supplemental opinion, the Board explicitly noted that "the element of discretion retained by the [Company]" was "in setting the amount of merit raises." DNLA II, 315 N.L.R.B. at 1236. Nowhere does the record indicate that the Company was free, under the policy, to ignore its merit-based criterion in making wage-increase judgments. Indeed, the ALJ found that the Company "had instituted a pattern and practice of evaluating the unit employees at the time of each employee's anniversary date, and that as a result of such evaluation the [Company] would grant a discretionary merit salary increase to the employee in an amount commensurate with the employee's evaluation." DNLA I, 304 N.L.R.B. at 515 (emphasis added). The Board therefore found that the Company's merit-increase policy was not completely discretionary. Rather, the employer was constrained both by the established procedures for evaluating employees and by the fixed criteria for making each individual merit decision.
 
 
 24
 The crucial question, therefore, is what Katz requires of an employer if an established merit-increase program is fixed as to timing and criteria, but discretionary as to amount.[3] Given that Katz proscribes unilateral changes to mandatory subjects of bargaining, the answer to this question is relatively simple. In this case, employees knew that they would receive annual merit increases based on an evaluation of their work: increases were denied only when an employee's evaluation was unsatisfactory (or when an employee was already at the top of the salary scale).[4] Because the disputed program was a mandatory subject of bargaining, the employer could not terminate the pay plan without first bargaining to impasse with the Union. In other words, when the criteria for determining discretionary wage increases are fixed (even if the amount of each individual increase is discretionary), then Katz demands that the Company continue to apply the same criteria and use the same formula for awarding increases during the bargaining period as it had previously.
 
 
 25
 Both this court and the NLRB have long applied this analytical framework to determine whether employers violate Katz when they unilaterally discontinue merit pay plans. As far back as 1971, this court held that an employer who had granted discretionary increases based on annual merit reviews was required to continue evaluating employees according to the plan. UAW v. NLRB (Udylite Corp.), 455 F.2d 1357, 1365 (D.C.Cir.1971). Likewise, in NLRB v. Blevins Popcorn Co., 659 F.2d 1173 (D.C.Cir.1981), the court ruled that, even though the wage increases in question "contained both automatic and discretionary elements," the employer was obligated to bargain with the union before it could "discontinue entirely the practice of granting annual wage increases." Id. at 1189 (emphasis added).[5]
 
 
 26
 While the Board's precedent in this area has not always been a model of clarity, its decisions similarly indicate that, when an employer has established a regular wage-increase program with fixed criteria, even though discretionary in amount, that program cannot be discontinued unilaterally. See, e.g., Rochester Inst. of Technology, 264 N.L.R.B. 1020, 1020, 1982 WL 23769 (1982) (The Board adopted the ALJ's findings that the company's merit-increase policy had become a condition of employment similar to an actually promised increase.), enforcement denied on other grounds, 724 F.2d 9 (2d Cir.1983); Allied Prods. Corp., 218 N.L.R.B. 1246, 1252, 1975 WL 5682 (1975) (Because the company had an established policy of evaluating the performance of its office clerical employees and rewarding such performance with wage increases, the employer could not suspend the entire program.), enforced as modified, 548 F.2d 644 (6th Cir.1977); General Motors Acceptance Corp., 196 N.L.R.B. 137, 137, 1972 WL 4330 (1972) ("[A]n element of discretion ... was retained by the [Company] with respect to particular employees, but certainly not to the entire [wage-increase] program."), enforced 476 F.2d 850 (1st Cir.1973).[6]
 
 
 27
 The Company points to two recent cases that found an employer's denial of wage increases to be lawful. However, in both instances, the employer did not suspend the program, but rather applied its usual evaluation criteria before deciding that no increases were justified. Thus, in American Packaging Corp., 311 N.L.R.B. 482, 1993 WL 188249 (1993), the employer "followed procedures used in the past and legitimately determined" the amount of an annual across-the-board bonus. Id. at 483. The Board ruled that the mere fact that use of the formula resulted in no bonus in that particular year did not make its use a change in existing practice. Id. Similarly, in Stone Container Corp., 313 N.L.R.B. 336, 1993 WL 496575 (1993), the employer's decision not to grant a wage increase was based on the results of its regular annual survey. There was no evidence that the employer used anything other than its usual criteria for determining the amount of the increase. See also Brannan Sand & Gravel Co., 314 N.L.R.B. 282, 1994 WL 363562 (1994) (The Board permitted an employer to make a unilateral change in its health care plan because the change was made in accordance with its regular review of the costs and benefits of the plan.).[7]
 
 
 28
 The Daily News was, therefore, required to continue its prior practice of making individualized determinations based on merit. Although the Company remained free to evaluate the merit of each employee and to deny increases if no one was deserving, it could not make an across-the-board policy determination based on non-merit criteria. It is undisputed, however, that the Company did not, in fact, base its decision to deny increases on particularized merit considerations. Rather, the Company made a broad policy determination that, regardless of merit, no unit employees should receive increases. By ignoring the established criteria for making its wage-increase decisions, the Company changed a fixed aspect of the policy.
 
 
 29
 The Board's finding that an individualized merit evaluation was the only established criterion for determining the amount of each increase has sufficient support in the record to require affirmance under Universal Camera. Indeed, the Company's editor, Robert Burdick, testified that, in general, no factors other than performance were considered by the Company in assessing raises. Tr. of Hearing (Dec. 13, 1989) 175, reprinted in P.A. 297. The employer has also made no assertion that the general economic status of the Company was part of the criteria that had previously been considered in determining the amount of the increases. More importantly, the record reflects that the Company was not economically unable to give the increases, and indeed, non-unit employees continued to receive raises as before.
 
 
 30
 The Board was also justified in finding that the employer did not use individual merit assessments in reaching its decision to deny increases to all unit employees. Editor Burdick admitted that at least some of the employees who were evaluated after July 1989 deserved increases based on the performance evaluations, but did not receive them. Id. at 176, reprinted in P.A. 298. In addition, two editorial employees testified that they were told by management that they would have received increases but for the ongoing Union negotiations. Tr. of Hearing (Dec. 12, 1989) 27, 33-34, reprinted in P.A. 148, 154-55. Thus, the record indicates that, under the Company's usual criteria, employees would have received raises, but that the Daily News opted to discontinue the entire program. Because the Daily News made an across-the-board decision not to grant any increases, rather than a decision based on the established criteria that each employee did not deserve one, the Company's action constituted an impermissible change in a mandatory subject of bargaining.[8]
 
 
 31
 B. The Company's Action Was Not a Legitimate Economic Bargaining Weapon
 
 
 32
 The Supreme Court has placed limits on the Board's power to "sit in judgment upon every economic weapon the parties to a labor contract negotiation employ." Insurance Agents', 361 U.S. at 497-98, 80 S.Ct. at 432. In Insurance Agents' the Court ruled that participants in collective bargaining may, without violating their duty to bargain, use tactics designed to exert economic pressure. Similarly, in American Ship, 380 U.S. at 318, 85 S.Ct. at 967, the Court held that a lockout in support of an employer's legitimate bargaining position does not violate employees' bargaining rights.
 
 
 33
 The Daily News rightly points out that these cases strip the Board of the power to interfere with the Company's legitimate economic weapons in the guise of enforcing a duty to bargain in good faith. However, the Board is only forbidden to pass judgment on a particular economic weapon if that weapon is "used in support of genuine negotiations." Katz, 369 U.S. at 747, 82 S.Ct. at 1113 (emphasis added). Katz made clear that the Board retained the power "to order the cessation of behavior which is in effect a refusal to negotiate." Id.; see also American Ship, 380 U.S. at 308, 85 S.Ct. at 962 (The Court specifically excluded from its discussion those cases where the employer used an economic weapon "as a means ... to evade his duty to bargain collectively.").
 
 
 34
 In this case, as in Katz itself, the unilateral action of the employer constitutes a refusal to negotiate to impasse over a mandatory subject of bargaining, which is a violation of section 8(a)(5) precisely because such an action impermissibly interferes with the collective bargaining process. It is clear beyond a doubt that the Company's action cannot fall within Insurance Agents' or American Ship because, in refusing to negotiate over a mandatory subject, the employer is evading the duty to bargain. Nothing in Insurance Agents', American Ship, or Katz allows an employer to refuse to bargain over a mandatory subject by simply declaring the refusal to be an "economic weapon" or tactic to gain leverage in negotiations. To condone such a proposition would make a mockery of the bargaining process.
 
 
 35
 C. The NLRB's Remedy is Sufficiently Administrable
 
 
 36
 Section 10(c) of the NLRA authorizes the Board, upon finding a violation of the Act, to order the violator "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]." 29 U.S.C. Sec. 160(c) (1988). The Supreme Court "has repeatedly interpreted this statutory command as vesting in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 898-99, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984). And the Court has cautioned the courts of appeals that "they should not substitute their judgment for that of the Board in determining how best to undo the effects of unfair labor practices." Id. at 899, 104 S.Ct. at 2812. Thus, the Board's choice of remedy "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218-19, 87 L.Ed. 1568 (1943).
 
 
 37
 In cases involving a violation of section 8(a)(5) based on a company's unilateral alteration of existing benefits, this court has found it appropriate " 'to order restoration of the status quo ante to the extent feasible, and in the absence of evidence showing that to do so would impose an undue or unfair burden upon the [employer].' " NLRB v. Cauthorne, 691 F.2d at 1025 (quoting Allied Prods. Corp., 218 N.L.R.B. at 1246). Such a rule is designed "to prevent the wrongdoer from enjoying the fruits of his unfair labor practices and gaining undue advantage at the bargaining table when he bargains about the benefits which he has already discontinued." John Zink Co., 196 N.L.R.B. 942, 942, 1972 WL 12497 (1972).
 
 
 38
 The Company argues that, in this case, because the amount of the wage increases was discretionary, there is no workable procedure for determining how much back pay any given employee might be owed. We disagree. The Daily News continued to give annual merit reviews and performance ratings to both unit and unrepresented employees and to grant merit increases to the latter group based on those reviews and ratings. Thus, in a back pay proceeding, the Board could consider, for each unit employee, the amounts of raises given to unrepresented employees with similar ratings; the amounts of increases given to the same employee in previous years when his or her rating was similar; the increases given to other editorial employees with similar ratings in previous years; and whether the employee was already at or near the top of the salary range for his or her position.
 
 
 39
 All of these criteria are sufficiently objective to confine the inquiry as to what the raise would have been. In addition, the employer remains free to advance any appropriate arguments regarding how the various factors would have been applied in specific cases. In any event, because the evidence from past years indicates that at least 80% of the eligible employees would have received some increase, the Board will undoubtedly come closer to approximating what would have occurred by attempting to estimate back pay, than by denying a back pay remedy altogether. See NLRB v. Overseas Motors, Inc., 818 F.2d 517, 521 (6th Cir.1987) ("The Board is required only to adopt a formula which will give a close approximation of the amount due; it need not find the exact amount due." (citation omitted)). Moreover, just because the Board's proposed remedy involves some uncertainty is not sufficient reason to reverse the decision. See NLRB v. International Ass'n of Bridge, Structural & Ornamental Iron Workers Local 433, 600 F.2d 770, 778-79 (9th Cir.1979) (A back pay award should be enforced despite uncertainty as to the identity of the victims of unfair labor practices.), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980); Chemvet Lab., Inc. v. NLRB, 497 F.2d 445, 452-53 (8th Cir.1974) (Back pay order is enforceable even though amounts of available overtime and identity of employees who have worked overtime are uncertain.). Given the deferential standard of review with respect to the Board's judgment in this matter, we do not find that the award of back pay is either unwarranted or an abuse of discretion.
 
 D. Other Claims
 
 40
 The Company's remaining claims lack merit. First, the Daily News contends that, under Katz, it is precluded from giving wage increases without a waiver from the Union. According to the Company, because the Guild expressed the desire to bargain about merit wages in general, there was no waiver, and the Company could not give the increases without violating Katz.
 
 
 41
 This argument is specious. As discussed supra, Katz only forbids a unilateral change of the employer's existing practices covering mandatory subjects of bargaining. Nothing prevented the Daily News from continuing its existing merit-increase program, particularly since the Union representative specifically demanded that the Company keep the program in place pending negotiation. Furthermore, simply because employees choose to negotiate over an existing term or condition of employment does not mean the employer is free to change the term unilaterally in the interim. Otherwise, Katz' proscription against unilateral change would be meaningless.
 
 
 42
 The Daily News also argues that the Board's decision should be reversed because it failed to reach a majority rationale and because the decision to overrule Anaconda Ericsson should not be enforced retroactively. We reject both of these claims. First, all four participating Board members did agree on the controlling legal principle that an employer may not unilaterally discontinue an established practice of granting merit increases even though the employer retained discretion as to the amount of the increases. See DNLA II, 315 N.L.R.B. at 1243-44 (Members Stephens and Cohen, concurring). Thus, this is not a case where "the Board's failure to articulate which test it was relying on, or, at a minimum, to explain how the same result could be reached under each of those tests, did not reflect the reasoned decisionmaking required of administrative agencies." Oil, Chemical & Atomic Workers Int'l Union v. NLRB, 46 F.3d 82, 91 (D.C.Cir.) (citing United Food & Commercial Workers Int'l Union v. NLRB, 880 F.2d 1422, 1436-37 (D.C.Cir.1989)), cert denied, --- U.S. ----, 116 S.Ct. 81, 133 L.Ed.2d 39 (1995).
 
 
 43
 Second, the retroactive overruling of Anaconda Ericsson does not constitute "an abrupt break with well-settled policy," United Food & Commercial Workers Local 150-A v. NLRB (Dubuque Packing Co.), 1 F.3d 24, 34 (D.C.Cir.1993) (internal quotation omitted), cert. denied, --- U.S. ----, 114 S.Ct. 2157, 128 L.Ed.2d 882 (1994), sufficient to reverse the Board's decision. Indeed, it is not at all clear that Anaconda Ericsson was inconsistent with the Board's ruling in this case or that it needed to be overruled. See note 6 supra. Nevertheless, to the extent the overruling was necessary to clarify the Board's precedent, such an effort is more appropriately viewed as an "attempt to fill a void in an unsettled area of the law," which is permissible under Dubuque Packing. 1 F.3d at 34 (internal quotation omitted).
 
 III. CONCLUSION
 
 44
 This case presents a more simple series of questions than the arguments of the parties or the long procedural history might lead one to believe. Under Katz, an employer may not unilaterally change a term or condition of employment with respect to a mandatory subject during the collective bargaining process. If an established merit-increase program is fixed as to timing and criteria and discretionary only as to amount, then the employer is obligated to keep the program in place and continue to apply the same criteria. Because the Daily News did not use its fixed criteria, but instead made a decision to discontinue the merit-pay program regardless of individual performance, we find that it changed an established term of employment with respect to a mandatory subject of bargaining, thereby violating Katz. Furthermore, the Board's proposed remedy is sufficiently administrable to justify enforcement. Therefore the petition for review is denied, and the cross-application for enforcement is granted.
 
 
 45
 So ordered.
 
 
 46
 KAREN LECRAFT HENDERSON, Circuit Judge, dissenting:
 
 
 47
 In NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the Supreme Court held that an employer violates section (8)(a)(5) of the National Labor Relations Act (Act) by unilaterally awarding discretionary merit increases during union negotiations. Now the majority holds it is a violation of the same section not to award such raises. Neither authority nor reason supports this "catch 22" conundrum.
 
 
 48
 In Katz, the Supreme Court rejected the contention that, because the merit raises awarded "were in line with the company's long-standing practice of granting quarterly or semiannual merit reviews," they "in effect, were a mere continuation of the status quo." 369 U.S. at 746, 82 S.Ct. at 1113. If awarding such a raise does not continue the status quo, I do not see how the raise can be "a fixed condition or term of employment," as the majority would have it. See Phelps Dodge Mining Co. v. NLRB, 22 F.3d 1493 (10th Cir.1994) ("Payments to employees which are fixed as to timing but discretionary in amount do not become part of the employees' reasonable expectation and thus are not considered 'terms and conditions' of employment.") (citing Daily News of Los Angeles v. NLRB, 979 F.2d 1571, 1575 (D.C.Cir.1992)).
 
 
 49
 The majority strains mightily, but unconvincingly, to escape the inevitable effect of Katz. Most fundamentally, the majority attempts to portray the annual increases as something other than "discretionary," dismissing that term as an "appellation" and a "label." Majority Op. at 408. Yet the Board itself so described the raises based on the administrative law judge's unassailable factual finding that "the amount of the increase, if any, is totally discretionary." 304 N.L.R.B. at 514. Given this total discretion, the Company was bound, as the majority concedes, only to give "an appropriate increase" if an employee's evaluation so "warranted." Maj.Op. at 408 (emphases added). Such a program may not have been "whimsical," as the majority states, but it does seem wispish. It plainly did not create a "fixed" term of employment or give employees any bankable expectations.[1]
 
 
 50
 The majority also seeks support from Circuit case law, see Maj.Op. at 412, but its authority is inapposite. In NLRB v. Blevins Popcorn Co., 659 F.2d 1173 (D.C.Cir.1981), the merit raise was "discretionary" only in that the amount varied according to the objective criterion of job classification. It did not depend, as the raises here do, on the employer's subjective assessment of the employee's performance. See Katz, 369 U.S. at 746, 82 S.Ct. at 1113-14 (distinguishing "the case as to so-called 'merit raises' which are in fact simply automatic increases to which the employer has already committed himself"). On the other hand, in UAW v. NLRB, 455 F.2d 1357 (D.C.Cir.1971), the court, "assuming that increases pursuant to the merit review plan were wholly discretionary," concluded that "employees would at least have expected that they would be evaluated according to the plan." 455 F.2d at 1365. Here, as the majority acknowledges, this expectation was satisfied. See Maj.Op. at 409 ("The Company did, however, continue to issue annual performance appraisals to all employees.").[2]
 
 
 51
 Because the Company's practice of awarding totally discretionary annual merit raises was not a fixed term or condition of employment, I dissent from the majority's denial of the petition for review.
 
 
 
 [1]
 29 U.S.C. Sec. 158(a)(5) (1988) states: "It shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees...."
 
 
 [2]
 The Company argues that these percentages are misleading, because some employees (such as those who had not yet worked a full year or who worked part-time) received neither performance evaluations nor increases. This contention, while true, is irrelevant to the Board's findings. The percentages indicate that a very large majority of employees who were eligible to receive increases under the program did, in fact, receive some kind of raise
 
 
 [3]
 The NLRB's supplemental decision (and the prior decision of this court) focused solely on the fact that the merit-increase program was fixed as to timing. While we find that the regularized, annual nature of the evaluations at issue is relevant to whether employees had come to view the merit increases as fixed terms or conditions of employment, see, e.g., Guy Gannett Publishing Co., 295 N.L.R.B. 376, 378, 1989 WL 224140 (1989) (Because an annual wage-increase policy had been granted for many years, "the work force surely was entitled to regard it as a permanent element in their wage structure program."), we do not believe that fixed timing alone would be sufficient to bring the program under Katz. In this case, had the Board found that the Company retained total discretion to grant the increases based on any factors it chose, we doubt that discontinuing the policy would have resulted in a violation of section 8(a)(5) even though the raises had been awarded annually
 
 
 [4]
 Supervising editor Robert Burdick stated in testimony before the ALJ that "it is our absolute policy to grant an increase when the supervisor feels that someone's work merits. And when someone's work doesn't, then that person simply does not get an increase." Tr. of Hearing (Dec. 13, 1989) at 129, reprinted in P.A. 251. Thus, unequivocal evidence in the record indicates that, prior to the Company's discontinuance of the merit-increase policy, a positive performance evaluation invariably corresponded to some form of wage increase
 
 
 [5]
 The Company points to the Second Circuit's decision in J.J. Newberry Co. v. NLRB, 442 F.2d 897 (2d Cir.1971), where the court ruled in favor of an employer that unilaterally discontinued a practice of periodic merit increases based on performance reviews. In that case, however, no collective bargaining representative had yet been certified, and so there was no one to consult in order to avoid acting unilaterally. Indeed, the Second Circuit subsequently distinguished Newberry on precisely this ground. See NLRB v. United Aircraft Corp., 490 F.2d 1105, 1111 & n. 6 (2d Cir.1973)
 
 
 [6]
 Even Anaconda Ericsson, which the Board overruled, does not appear to run contrary to this general proposition. In that case, the Board ruled in favor of an employer who refused to grant a discretionary general wage increase during collective bargaining negotiations despite the fact that such an increase had been given in each of the prior five years. However, there was no evidence that the general wage increases were determined through the application of any fixed criteria. Therefore, it is unclear whether any term or condition of employment had been established. See id. at 834-35
 
 
 [7]
 The Company's reliance on Winn-Dixie Raleigh, Inc., 267 N.L.R.B. 231, 1983 WL 24904 (1983), is also misplaced because there was no finding in that case that the employer had established fixed criteria for determining the amount of its yearly, across-the-board wage increase. See id. at 235
 
 
 [8]
 The Daily News asserts that its decision to stop granting the wage increases was not a permanent policy change because it informed Union representatives that future merit increases would be subject to negotiations with the Guild regarding the economic package as a whole. Thus, according to the Company, this case is similar to Stone Container and American Packaging, where the NLRB found no violation when an employer simply decided not to award a discretionary merit increase in a given year. However, as discussed supra, in those cases, the employers applied their existing formulae for granting wage increases, and then decided that no one was eligible. In contrast, the Daily News suspended the entire policy despite the existence of deserving employees. Such an action constitutes a change in a term or condition of employment regardless of how long the suspension lasts. See, e.g., Udylite Corp., 455 F.2d at 1365 (The court found a violation even though the unilateral suspension of a merit review plan lasted less than five months.)
 
 
 [1]
 That the discretionary raise was not a "fixed" term of employment is clear from the obvious impracticality of the Board's remedy, which the majority has endorsed ("that the employees be paid the 'difference between their actual wages and the wages they would have otherwise received' if the merit increases had not been unilaterally discontinued", 304 N.L.R.B. at 516). As we observed in our earlier opinion in this case: "Given the ALJ's finding here that the amounts of raises in the past practice were 'totally discretionary', it is altogether unclear how the ALJ or the Board would enforce its order that the News pay the employees 'the difference between their actual wages and the wages they would have otherwise received', as the latter by hypothesis are unascertainable." 979 F.2d at 1577 (record citations omitted)
 
 
 [2]
 The opinions the majority cites from other circuits, see Maj.Op. at 411, are no more helpful. In NLRB v. Allied Prods. Corp., 548 F.2d 644 (6th Cir.1977), the court upheld the NLRB's conclusion that the discontinuance of an annual review program violated the Act, while in NLRB v. Dothan Eagle, Inc., 434 F.2d 93 (5th Cir.1970), the raises at issue were not "totally discretionary" but rather "automatic progression wage increases" of "10 to 15 cents per hour" that "were regularly granted every six months." 434 F.2d at 96